**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

<span style="color:red">PUBLIC VERSION</span>

| | |
|---|---|
| PARKERVISION, INC., | Civil Action No. 6:20-cv-00108-ADA |
| Plaintiff, | |
| | **JURY TRIAL DEMANDED** |
| vs. | |
| INTEL CORPORATION, | ███████████████ |
| Defendant. | |

**INTEL CORPORATION'S _DAUBERT_ MOTION TO EXCLUDE CERTAIN OPINIONS AND TESTIMONY OF PAUL C. BENOIT**

## TABLE OF CONTENTS

Page

I.      INTRODUCTION......................................................................................................1

II.     LEGAL STANDARD .............................................................................................2

III.    ARGUMENT ...........................................................................................................3

        A.      Mr. Benoit's Opinions And Testimony Relying On Evidence
                That Is Fourteen Years Out Of Date Should Be Excluded. ...........................3

                i.       Reliance on the 1999 negotiations between ParkerVision and Qualcomm
                         should be precluded. .............................................................................3

                ii.      Reliance on the 1999 technology license agreement between ParkerVision
                         and Symbol should be precluded. .........................................................8

                iii.     Reliance on a 1999 press release should be precluded. ........................9

        B.      Mr. Benoit's Damages Opinion Violates The Federal Circuit's
                Entire Market Value Rule..............................................................................11

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Applied Medical Resources Corp. v. United States Surgical Corp.*,
    435 F.3d 1356 (Fed. Cir. 2006)................................................................................5

*Dataquill Ltd. v. High Tech Computer Corp.*,
    2012 WL 1284381 (S.D. Cal. Apr. 16, 2012)................................................7, 9

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993)..............................................................................................2

*ePlus, Inc. v. Lawson Software, Inc.*,
    700 F.3d 509 (Fed. Cir. 2012).....................................................................5, 8, 10

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
    694 F.3d 51 (Fed. Cir. 2012)....................................................1, 2, 11, 13, 14

*Lucent Technologies, Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009)...........................................................................11

*Neely v. PSEG Texas, LP*,
    2012 WL 12877923 (W.D. Tex. May 29, 2012)..................................................2

*Powell v. Home Depot U.S.A, Inc.*,
    663 F.3d 1221 (Fed. Cir. 2011)....................................................................5, 8, 10

*Power Integrations, Inc. v. Fairchild Semiconductor International, Inc.*,
    904 F.3d 965 (Fed. Cir. 2018)...................................................................2, 12, 13

*ResQNet.com, Inc. v. Lansa, Inc.*,
    594 F.3d 860 (Fed. Cir. 2010)..............................................................................6

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011)............................................................................5

*VirnetX, Inc. v. Cisco Systems, Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014).........................................................................12

*Whitserve, LLC v. Computer Packages, Inc.*,
    694 F.3d 10 (Fed. Cir. 2012)................................................................................7

*Wordtech Systems, Inc. v. Integrated Networks Solutions, Inc.*,
    609 F.3d 1308 (Fed. Cir. 2010)...................................................................1, 6, 9, 10

## STATUTES, RULES, AND REGULATIONS

Fed. R. Evid. 702 ...................................................................................................................2

## I.     INTRODUCTION

The Court should exclude ParkerVision's damages expert Paul Benoit's opinions that directly contradict Federal Circuit law.  Mr. Benoit's opinions are flawed for two primary reasons.

***First***, Mr. Benoit's damages opinions rely in part on three categories of unreliable evidence: (1) evidence from ParkerVision's 1998-1999 negotiations with Qualcomm; (2) a 1999 technology agreement between ParkerVision and Symbol; and (3) a 1999 press release about a license renewal between Intel and Qualcomm.  Each of these categories of information is fatally flawed, including because the evidence predates the hypothetical negotiation in this case by over fourteen years.  Indeed, in ParkerVision's litigation against Qualcomm, the district court excluded Mr. Benoit's reliance on both ParkerVision's negotiations with Qualcomm and the Symbol agreement because they were seven years prior to the hypothetical negotiation.  That evidence is even more unreliable here, where the evidence pre-dates the hypothetical negotiation by ***fourteen years***.  In fact, despite his reliance on this (previously excluded) 1999 evidence, even Mr. Benoit admits that the ParkerVision agreement from 1999 is "***too far removed from the hypothetical negotiation date to be instructive*** as to the agreement that would have been entered into between ParkerVision and Intel for use of the Patents-in-Suit." Ex. 1, Benoit Rpt., ¶152.[1]  Moreover, despite the Federal Circuit's clear instruction that "comparisons of past patent licenses to the infringement must account for 'the technological and economic differences' between them," *Wordtech Systems, Inc. v. Integrated Networks Solutions*, *Inc.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010), and that non-comparable agreements cannot be used to determine damages because such agreements improperly skew the jury's assessment of damages, *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 80 (Fed. Cir. 2012), Mr. Benoit makes no attempt to demonstrate the

---

[1] All exhibits are attached to the Declaration of Harry Hanson, filed concurrently herewith.

comparability of these old agreements.  He should therefore be precluded from relying on this evidence.

**Second**, Mr. Benoit's calculation of damages in this case—indeed, the ***majority*** of his damages number—relies on sales of baseband chips, which are not accused of infringement, and which are separate chips from the transceiver chips that ParkerVision does accuse of infringement. Furthermore, Mr. Benoit admits that these separate baseband chips contain their own valuable features.  But in direct violation of settled Federal Circuit law, he makes no attempt to demonstrate, let alone cite any evidence demonstrating, that the accused down-conversion feature of the transceiver drove demand of the separate baseband chip.  *See, e.g.*, *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 978 (Fed. Cir. 2018); *LaserDynamics*, 694 F.3d at 63.  Accordingly, Mr. Benoit's inclusion of baseband chip revenues in his damages calculations must be excluded.

## II.   LEGAL STANDARD

An expert witness may testify only if: (1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact understand the evidence or determine a fact in issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is based on reliable principles and methods; and (4) the expert has reliably applied the principles and methods.  Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 591-94 (1993).  ParkerVision has the burden to show that Mr. Benoit's testimony meets these requirements.  *See Neely v. PSEG Tex., LP*, 2012 WL 12877923, at *2 (W.D. Tex. May 29, 2012).

III.    **ARGUMENT**

A.    **Mr. Benoit's Opinions And Testimony Relying On Evidence That Is Fourteen Years Out Of Date Should Be Excluded.**

In support of his opinion as to the reasonable royalty that ParkerVision and Intel would have allegedly agreed to in a hypothetical negotiation in *2013*, Mr. Benoit relies on several categories of evidence from *1999*: (a) negotiations between ParkerVision and Qualcomm; (b) an agreement between ParkerVision and Symbol; and (c) a news release about a contract amendment between Intel and Qualcomm.   As to each, Mr. Benoit's reliance on that outdated evidence is unreliable.

i.    **Reliance on the 1999 negotiations between ParkerVision and Qualcomm should be precluded.**

Mr. Benoit relies on correspondence and proposed licensing terms exchanged between ParkerVision and Qualcomm in 1999.   Ex. 1, Benoit Rpt., ¶¶58-78.   Reliance on these communications is unreliable for two key reasons.  *First*, as Mr. Benoit admits, Qualcomm and ParkerVision never entered into any license agreement, and neither party ever agreed to the terms the parties exchanged.  *Id.*, ¶78; *see also* Ex. 2, Benoit Dep. at 84:1-25 (admitting that "I'm not aware of any agreements executed between [Qualcomm and ParkerVision]" and that "I'm not aware of any payments between -- from Qualcomm to ParkerVision").   *Second*, the communications took place more than fourteen years before the hypothetical negotiation in the present case.   In fact, another court precluded Mr. Benoit from relying on evidence from the very same Qualcomm-ParkerVision negotiations in support a reasonable royalty in that case.   Ex. 3, *ParkerVision Inc. v. Qualcomm Inc.*, Case No. 3-11-cv-00719, Dkt No. 395 (M.D. Fla. Oct. 11, 2013) at 7-10 (hereinafter the "*Qualcomm* Order").

The evidence on which Mr. Benoit relies includes (a) internal Qualcomm communications that purport to tout the merits of ParkerVision's technology and (b) royalty rates that Qualcomm

proposed to pay ParkerVision in exchange for an exclusive technology agreement that was never executed. *See generally* Ex. 1, Benoit Rpt., ¶¶58-78. All of these discussions took place in 1998 and 1999, and predate June 17, 2003, when the first of the patents asserted in this case issued. The discussions also long predate the hypothetical negotiation in the present case, which Mr. Benoit admits would have taken place approximately fourteen years later in August 2013. Ex. 1, Benoit Rpt., ¶142; Ex. 2, Benoit Dep. at 64:7-11.

Mr. Benoit's reliance on the evidence about these statements and negotiations is not reliable. Mr. Benoit states that during the negotiations, for example, Qualcomm provided "a royalty analysis with royalty rates of 5%, 3.5% and 1.75% and cap rates of $0.25, $0.30, and $0.45 for receivers, transceivers, and integrated basebands, respectively." Ex. 1, Benoit Rpt., ¶69. Mr. Benoit relies on Qualcomm's proposal for his opinion that a licensee of the patents-in-suit would have agreed to a royalty on not only the accused transceiver chips, but also the unaccused baseband chips, which are often sold together in the same chipset. Ex. 1, Benoit Rpt., ¶181. Specifically, he opines that Qualcomm's proposed rate structure is "a recognition that ParkerVision's technology was perceived to drive value beyond the value of the transceiver," and that "ParkerVision's technology contributed to revenues and profits of the integrated baseband products beyond the transceiver component." *Id*.

Another court in a different ParkerVision case has already stricken Mr. Benoit's opinions relying on these Qualcomm negotiations. In ParkerVision's litigation against Qualcomm in the Middle District of Florida, Mr. Benoit relied on the **same** 1999 Qualcomm-ParkerVision negotiations in support of his opinion about the outcome of a hypothetical negotiation between Qualcomm and ParkerVision, which, in that case, would have taken place in 2006. The district court granted Qualcomm's *Daubert* motion holding that Mr. Benoit's reliance on those 1999

negotiations was unreliable.  The court found that the gap between 1999 and 2006 was simply too great for the 1999 negotiations to be reliable.  The court explained that "there can be little dispute that the 1999 documents and negotiations are too different from the hypothetical negotiation to provide a reliable foundation for Benoit's economic analysis."  Ex. 3, *Qualcomm* Order, at 9.  As the court recognized, "between 1999 and 2006, there were seismic changes in the marketplace for wireless receivers, transceivers, and baseband chips."  *Id.* at 8.  "Accordingly, the Court will preclude Benoit from relying on the 1999 Documents and negotiations."  *Id.* at 10; *see also* Ex. 2, Benoit Dep. at 87:18-20 (admitting that as a result of the district court's decision "I could not rely on the rates themselves or a sharing percentage between the parties that underlied those rates.")

Despite this decision, Mr. Benoit attempts again to rely on this previously excluded 1999 evidence.  But the district court's reasoning in *Qualcomm* applies with ever greater force here.

***First***, a damages analysis must be "tied" to "the hypothetical negotiations that would have taken place in light of . . . circumstances at the relevant time."  *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011); *see also Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 435 F.3d 1356, 1361 (Fed. Cir. 2006) (damages must be "based on a hypothetical negotiation at the time that infringement began, not an earlier" date).  The Federal Circuit routinely bars reliance on outdated patent licenses as unreliable and irrelevant.  *See, e.g., ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 523 (Fed. Cir. 2012) (excluding a damages expert that assigned "great weight" to agreements that were four and five years old); *Powell v. Home Depot U.S.A, Inc.*, 663 F.3d 1221, 1240 (Fed. Cir. 2011) (criticizing reliance "on negotiations that occurred in 2004" when calculating damages for infringement just two years later because the 2004 negotiations occurred "well before" infringement began).  This is not a matter of form over substance:  As the district court in *Qualcomm* recognized, "between 1999 and 2006, there were

seismic changes in the marketplace for wireless receivers, transceivers, and baseband chips." Ex. 3, *Qualcomm* Order at 8; *see also* Ex. 2, Benoit Dep. at 33:2-7; 91:17-22.

Whereas in the Qualcomm litigation, the 1999 negotiations pre-dated the hypothetical negotiation by seven years, in this case, the hypothetical negotiation between ParkerVision and Intel would have been in August 2013, meaning that the 1999 negotiations pre-date the hypothetical negotiation in this case by *at least fourteen years*. Mr. Benoit makes no effort to connect the time periods. Instead, Mr. Benoit admits that another ParkerVision agreement from 1999 was "*too far removed from the hypothetical negotiation date to be instructive* as to the agreement that would have been entered into between ParkerVision and Intel for use of the Patents-in-Suit." Ex. 1, Benoit Rpt., ¶152.

In short, the fourteen-year gap between the Qualcomm-ParkerVision statements and the hypothetical negotiation in this case renders the Qualcomm evidence unreliable. Reliance on those negotiations and statements should be precluded for that reason alone.

*Second*, there is no evidence that the 1999 Qualcomm negotiations were for a comparable license; rather, the existing evidence leads to the opposite conclusion. *See Wordtech*, 609 F.3d at 1320 ("[C]omparisons of past patent licenses to the infringement must account for 'the technological and economic differences' between them." (quoting *ResQNet v. Lansa*, 594 F.3d 860, 873 (Fed. Cir. 2010))). Qualcomm and ParkerVision never executed any agreement; ParkerVision did not produce any draft agreements or term sheets; Mr. Benoit does not recall reviewing any; and Mr. Benoit does not cite any draft agreements or term sheets in his report. Ex. 2, Benoit Dep. at 82:14-83:9.

Moreover, the only evidence in the record demonstrates that the Qualcomm license would *not* have been comparable to the hypothetical negotiation in the present case. The 1999

negotiations between ParkerVision and Qualcomm were for an exclusive technology transfer and license, and ultimately never led to an executed agreement.  *See* Ex. 3, *Qualcomm* Order at 8; Ex. 2, Benoit Dep. at 84:1-25.  Courts reject reliance on such "technology licenses," which include transfer of know-how, to estimate the value of a non-exclusive license to practice particular patents without accounting for that difference.  *See, e.g.*, *Dataquill Ltd. v. High Tech Computer Corp.*, 2012 WL 1284381, at *7 (S.D. Cal. Apr. 16, 2012) (barring reliance on a technology revenue-sharing agreement).  Courts also recognize that proposed, as opposed to executed, agreements have limited probative value.  *See Whitserve, LLC v. Comput. Packages, Inc.*, 694 F.3d 10, 25-34 (Fed. Cir. 2012) (noting that "proposed licenses may have some value for determining a reasonable royalty"; however, their "evidentiary value is limited").

In its order granting Qualcomm's *Daubert* motion, the Middle District of Florida found that an agreement resulting from the 1999 negotiations would not have been comparable to the hypothetical negotiation in that case.  There, the court explained that "[w]hile the 1999 negotiations contemplated a technology transfer with exclusivity for Qualcomm, … the 2006 hypothetical negotiation was for a bare, non-exclusive patent license." Ex. 3, *Qualcomm* Order at 8.[2]  The same reasoning applies here—a proposed ***technology*** license is not reliable evidence for a non-exclusive patent license for six patents (the type of agreement at issue in the hypothetical negotiations here), and Mr. Benoit makes no attempt to account for these differences in economic comparability.

***Finally***, in *Qualcomm*, the parties to the 1998-1999 negotiations upon which Mr. Benoit sought to rely were the same as the parties to the hypothetical negotiation at issue.  Here, by

---

[2] The court also noted that "[t]he Court does not reject the 1999 Documents and negotiations simply because they were unsuccessful, although this fact does counsel against use of the evidence." Ex. 3, *Qualcomm* Order at 9, n.5.

contrast, Intel is the defendant.  In other words, even if these negotiations provided some evidence about how ParkerVision **and Qualcomm** would have valued ParkerVision's contributions to **Qualcomm's** products, Mr. Benoit does not attempt to explain, how, if at all, Qualcomm's products in 1999 were in any way similar to Intel's products in 2013, and thus offers no basis to believe that negotiations about **Qualcomm's** products provide reliable evidence about **Intel's** products. [3]

> ii.   **Reliance on the 1999 technology license agreement between ParkerVision and Symbol should be precluded.**

Mr. Benoit relies on a 1999 technology license agreement between ParkerVision and Symbol (Ex. 4, PV00185210) despite admitting that the agreement is "too far removed from the hypothetical negotiation date to be instructive as to the agreement that would have been entered into between ParkerVision and Intel for use of the Patents-in-Suit." Ex. 1, Benoit Rpt., ¶152.  Mr. Benoit purports to limit his reliance on the agreement to "the structure of the agreement that would have been entered into between ParkerVision and Intel for the use of the Patents-in-Suit." *Id.*  But this reliance is improper.

**First**, as Mr. Benoit admits, the agreement—which pre-dates the hypothetical negotiation by fourteen years—is "too far removed from the hypothetical negotiation date to be instructive as to the agreement that would have been entered into between ParkerVision and Intel for use of the Patents-in-Suit." Ex. 1, Benoit Rpt., ¶152.  *See also ePlus*, 700 F.3d at 523; *Powell*, 663 F.3d at 1240.  This concession belies Mr. Benoit's attempt to rely on the agreement for the features he likes (e.g., a running royalty) and disclaim the rest.

**Second**, as the Middle District of Florida has already found, the Symbol agreement is not comparable.  In that case, Qualcomm filed a *Daubert* motion seeking to preclude Mr. Benoit's

---

[3] Mr. Benoit's reliance on this evidence should be excluded for an additional reason: ParkerVision has refused to produce to Intel Mr. Benoit's report from the Qualcomm litigation relying on this same evidence he seeks to rely on here.

reliance on the same 1999 Symbol technology agreement that he seeks to rely on here. The district court issued an oral ruling granting that motion, holding that "for reasons not dissimilar to the reasons I excluded the '98-'99 [Qualcomm-ParkerVision] transactions, I'm also going to exclude the Symbol transaction as a comparator in terms of the assessment of reasonable royalty." Ex. 5, *ParkerVision Inc. v. Qualcomm Inc.*, No. 3-11-cv-00719, Dkt No. 438 (M.D. Fla. Oct. 25, 2013) at 46:2-8; *see also* Ex. 2, Benoit Dep. at 92:2-6 (admitting that the district court in *Qualcomm* excluded his reliance on the Symbol agreement).

Moreover, like the Qualcomm-ParkerVision negotiations, the Symbol agreement is not a patent license agreement but a ***technology*** license agreement (Ex. 4, PV00185210 at 210). And while the Federal Circuit has made clear that "comparisons of past patent licenses to the infringement must account for 'the technological and economic differences' between them," *Wordtech*, 609 F.3d at 1320, Mr. Benoit makes no effort to account for that fundamental economic difference. Courts regularly reject reliance on such "technology licenses," which include transfer of know-how, to estimate the value of a non-exclusive license to practice particular patents without accounting for that difference. *See, e.g.*, *Dataquill*, 2012 WL 1284381, at *7.

### iii.    Reliance on a 1999 press release should be precluded.

To support his opinion that "ParkerVision and Intel would have agreed to a running royalty per transceiver unit sold," Ex. 1, Benoit Rpt., ¶138, Mr. Benoit states in paragraph 137 of his report that "Intel has paid running royalties to at least Qualcomm." The sole evidence he cites in support is a 1999 press release issued by Qualcomm, which reports that:

> Qualcomm Incorporated (Nasdaq: QCOM), pioneer and world leader of Code Division Multiple Access (CDMA) digital wireless technology, DSP Communications Inc. and Intel Corporation today announced that the companies have entered into an agreement for the continuation, following the acquisition of DSPC by Intel, of a CDMA ASIC patent license signed by Qualcomm and DSPC in 1995. The 1995 agreement granted DSPC a royalty-bearing license under certain of Qualcomm's patents to make and sell CDMA ASICs to Qualcomm's subscriber terminal licensees and granted Qualcomm a cross-license for

CDMA ASICs under DSPC's patents. Under the new agreement, DSPC would continue to hold the royalty-bearing license as a wholly owned subsidiary of Intel and Qualcomm would be extended licenses under certain of Intel's patents.[4]

Again, Mr. Benoit's reliance on this evidence is unreliable.

*First*, the agreement and its press release predate the hypothetical negotiation by 14 years—and are thus too old to be instructive. *See ePlus*, 700 F.3d at 523; *Powell*, 663 F.3d at 1240.

*Second*, Mr. Benoit never analyzed whether the agreement referenced in the press release would be comparable to a hypothetical negotiation in this case. Indeed, Mr. Benoit wholly failed to "account for 'the technological and economic differences' between" the agreement discussed in the press release and a hypothetical agreement between ParkerVision and Intel. *Wordtech*, 609 F.3d at 1320. He admitted that he had never reviewed the underlying agreement (Ex. 2, Benoit Dep. at 152:21-153:3 ("Q. Mr. Benoit, have you seen this agreement before? A. I don't think so. Q. This is the agreement that the press release is referencing -- the press release you cited is referencing; right? A. It seems to have similarities. So I would expect that to be the case.")), that his report does not cite the agreement (Ex. 2, Benoit Dep. at 151:17-20) ("Q. Now, to be clear, you don't actually cite to the underlying agreement; do you, only the press release? A. True.")), and that he "didn't analyze this agreement to determine whether it was economically or technologically comparable to the hypothetical negotiation in this case" (Ex. 2, Benoit Dep. at 155:19-23). In addition, Mr. Benoit ███████████████████████████ ████████████████████.

---

[4] Ex. 6, https://www.qualcomm.com/news/releases/1999/11/qualcomm-dspc-and-intel-agree-continue-licenses-and-explore-opportunities.

**B.      Mr. Benoit's Damages Opinion Violates The Federal Circuit's Entire Market Value Rule.**

Mr. Benoit also improperly opines that Intel owes ParkerVision royalties on *unaccused* products (specifically baseband chips) without showing that the accused feature in the accused chips (the down-conversion feature in the receiver chips) drove sales of the unaccused baseband chips as required by settled Federal Circuit law.

To the extent a plaintiff seeks royalties for the sale of components beyond the Smallest Saleable Patent Practicing Unit (SSPPU), including related products, the Entire Market Value Rule requires that plaintiff show that the accused feature "drives the demand" of those unaccused components. *See LaserDynamics,* 694 F.3d at 67 ("Where small elements of multi-component products are accused of infringement, calculating a royalty on the entire product carries a considerable risk that the patentee will be improperly compensated for non-infringing components of that product.  Thus, it is generally required that royalties be based not on the entire product, but instead on the 'smallest salable patent-practicing unit.' … The entire market value rule is a narrow exception to this general rule.  If it can be shown that the patented feature drives the demand for an entire multi-component product, a patentee may be awarded damages as a percentage of revenues or profits attributable to the entire product."); *id.* at 67-68 ("We reaffirm that in any case involving multi-component products, patentees may not calculate damages based on sales of the entire product, as opposed to the smallest salable patent-practicing unit, without showing that the demand for the entire product is attributable to the patented feature.").  It is not enough to show that the accused feature is valuable or important or that the product would not be commercially viable without it; it must be proven that the accused feature "is what motivates consumers to buy [the product] in the first place." *Id.* at 68; *see also Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1337-38 (Fed. Cir. 2009) (royalty could not be properly calculated based on the value of the

entire Outlook program because "there was no evidence that anybody anywhere at any time ever bought Outlook ... because it had [the patented] date picker"). If the patent owner seeks to include in its damages calculation royalties on products beyond the SSPPU, the patent owner must "show that the patented feature was the ***sole*** driver of consumer demand, i.e., that it ***alone*** motivated consumers to buy." *Power Integrations,* 904 F.3d at 980.[5]  Expert opinions that include revenue from products "without demonstrating that the patented features drove the demand for those products" must be excluded under *Daubert. VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1328 (Fed. Cir. 2014).

Mr. Benoit readily admits that the only chips accused of infringement in this case are transceiver chips, and that the baseband chips are not accused of infringement. Ex. 2, Benoit Dep. at 215:7-20. Mr. Benoit never opines that the baseband chip should be included in the SSPPU. To the contrary, as Mr. Benoit admits, the transceiver (branded SMARTi) and basebands (branded X-Gold) are separate chips (*id.*), and, as shown by Exhibits N and P to Mr. Benoit's report, ██████ ████████████████████████████████████████████████████. Ex. 1, Benoit Rpt., Exhibits N, P.  The Intel sales and transaction data relied on by Mr. Benoit—████████████ ██████████████████████████████████████—demonstrates that they are separate products. *See, e.g.*, Ex. 7, 96106DOC00000010 (revenue and unit data for transceivers); Ex. 8, 96103DOC00361987 (revenue and unit data for basebands); Ex. 9, 96103DOC00021080 (transactions data for transceivers); Ex. 10, 96103DOC00361911 (transactions data for basebands).

Nevertheless, Mr. Benoit includes royalties for the (unaccused) baseband chips in his calculations, opining that they form the basis for the "convoyed sales" royalties. Ex. 2, Benoit

---

[5] All emphases are added unless otherwise noted.

Dep. at 220:19-24.[6]  In fact, the royalties Mr. Benoit calculates based on Intel's baseband chips (as opposed to the accused transceiver chips) form the **_majority_** of ParkerVision's damages calculation:  Mr. Benoit opines that more than 57% of the total royalty Intel should pay represents a royalty for convoyed sales of baseband chips.  Ex. 2, Benoit Dep. at 223:11-224:25 (admitting that the "total royalty … you have opined that Intel should pay is 294,576,883" and that "about $168.5 million represents the amount that you've opined would be a reasonable royalty for use of the patents-in-suit for convoyed sales" of the baseband chips); Ex. 1, Benoit Rpt., Exhibits C.1, G. If sales of baseband chips were excluded, ParkerVision's claimed damages would be less than half of its demand.  Ex. 2, Benoit Dep. at 226:10-13; Ex. 1, Benoit Rpt., Exhibit C.1.

Although the Entire Market Value Rule clearly requires ParkerVision to prove that the accused feature is the sole driver of sales of the baseband chips in order to include sales of baseband chips in his royalty calculation, Mr. Benoit's analysis falls far short of doing so:

- Mr. Benoit admits that "some of the features that the baseband chip provides are valuable to Intel's customers."  Ex. 2, Benoit Dep. at 230:13-16.  But he provides no analysis "about the effect of those features on consumer demand or the extent to which those features were responsible for the products' value." *Power Integrations*, 904 F.3d at 978.

- Mr. Benoit admits that while "the customer that's primarily at issue in this case is Apple" (Ex. 2, Benoit Dep. at 237:19-20), he does not have any knowledge of what

---

[6] In his deposition, Mr. Benoit used the term "convoyed sales" as an apparent short-hand to refer to "a royalty that goes beyond the transceiver."  Ex. 2, Benoit Dep. at 149:13-16.  Regardless of the term used, ParkerVision's expert must meet the Entire Market Value Rule to include sales of unaccused products in his royalty calculation. *LaserDynamics*, 694 F.3d at 67.

features motivated Apple to buy the cellular modem chipsets (including the transceiver and baseband chips) from Intel (Ex. 2, Benoit Dep. at 235:4-8).

- He admits that he did not analyze the motivations of any of Intel's customers that led them to buy baseband chips from Intel.  Ex. 2, Benoit Dep. at 235:18-22 ("Q. Where in your report did you analyze the motivations of any Intel's -- of Intel's customers to buy baseband chips from Intel?  A. I don't think that's a requirement of my analysis. As I said before, I don't think I can give you any more information.").

- And as he admits (Ex. 2, Benoit Dep. at 236:25-237:15), his report does not contain or cite any consumer surveys or market studies about what drives demand for baseband chips.  *See LaserDynamics*, 694 F.3d at 69 (faulting absence of "market studies or consumer surveys").

Mr. Benoit identified in his deposition the following paragraphs of his report as the ***entirety*** of the basis for seeking royalties on sales of baseband chips:  paragraph 69, figure 7 of paragraph 109, paragraph 110, and paragraphs 180-183.  Ex. 2, Benoit Dep. at 239:21-240:23.  But none of these, independently or together, shows that the accused feature in the receiver of the transceiver chip drives sales for the baseband chips.

**Paragraphs 69 and 181**:  Mr. Benoit discusses ParkerVision's 1999 negotiations with Qualcomm (discussed above, *supra* pp. 3-8).  He relies on royalty caps proposed in those negotiations as purported evidence that "ParkerVision's technology contributed to revenues and profits of the integrated baseband products beyond the transceiver component." Ex. 1, Benoit Rpt., ¶181.  As explained above, evidence about these negotiations, which pre-date the hypothetical negotiation by fourteen years and never led to an actual agreement, is evidence that Mr. Benoit

was precluded from relying on in *Qualcomm*.  *See supra* pp. 4-5; Ex. 3, *Qualcomm* Order at 8.[7]

More fundamentally, this evidence about negotiations over *Qualcomm's* products, which unlike

Intel's products, featured an "***integrated*** baseband" (Ex. 1, Benoit Rpt., ¶181), says nothing about

the whether the accused features in Intel's transceiver chips drove demand for Intel's separate,

standalone baseband chips.

**Figure 7 of Paragraph 109, Paragraph 110, Paragraph 180**:  In paragraph 110, Mr.

Benoit says: "



, it is reasonable to conclude that Infineon's transceivers drove additional sales of its

baseband products."  Ex. 1, Benoit Rpt., ¶110.  But importantly, ***none of the transceivers sold by***

***Infineon from*** ▮▮▮▮▮▮▮ ***included the accused feature***, and none has been accused of

infringement in this case.  Ex. 2, Benoit Dep. at 253:19-23 (admitting that "Infineon and Intel were

not selling any accused products" in those years).  Accordingly, sales of such transceivers, and

their alleged impact on other products, are irrelevant to whether the ***accused feature*** of the accused

transceivers drove sales of baseband chips.  Moreover, the only purported evidence for Mr.

Benoit's proposition is (a) a press release from 2008 saying that Infineon sees a growing demand

in its RF products and (b) a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[7] Indeed, Qualcomm's products have been found not to even use the accused feature, *see
ParkerVision Inc. v. Qualcomm Inc.*, Case No. 14-1612 (Fed. Cir. July 27, 2015), and in the
Qualcomm litigation, ▮▮▮▮▮▮▮▮▮▮▮▮▮, *see* Ex.
11, *ParkerVision Inc. v. Qualcomm Inc.*, No. 3-11-cv-00719, Dkt No. 440 (M.D. Fla. Oct. 25,
2013) at 139:2-14.

██████ (figure 7 of paragraph 109).  But, at best, this evidence shows transceiver sales increasing along with baseband sales—i.e., correlation, not causation.

In the next sentence of paragraph 110, Mr. Benoit asserts that "[s]imilarly, Intel's advancements in its receiver technology resulting from use of the Patents-in-Suit drove additional sales of its baseband products." Ex. 1, Benoit Rpt., ¶110.  But critically, and highlighting the unreliability of his opinions, Mr. Benoit cites *no evidence in support of that conclusory sentence*. Indeed, he does not cite any evidence that that the accused functionality even drove sales of the *transceiver*.

Paragraph 180 relies on the same ██████ regarding baseband demand (figure 7 of paragraph 109) but reaches an even weaker (and equally insufficient) conclusion:  "Intel's advancements in its receiver technology resulting from use of the Patents-in-Suit *would have been expected to drive* additional sales of its baseband products." Ex. 1, Benoit Rpt., ¶180.

**Paragraph 182**:  Paragraph 182 relies on the 1999 agreement between Symbol and ParkerVision (discussed above, *supra* pp. 8-9) and another technology agreement between ParkerVision and VIA, ██████████████████████ ██████████████████.  But Mr. Benoit admits that the Symbol agreement is not comparable to the hypothetical negotiation in this case because it pre-dates the hypothetical negotiation by fourteen years. Ex. 1, Benoit Rpt., ¶152.  Moreover, as to both Symbol and VIA, any evidence of what might have driven sales of *Symbol's* products or *VIA's* products utterly fails to establish what features actually drive sales of *Intel's* entirely different baseband processors—and Mr. Benoit offers no explanation of why the demand for those products would be at all instructive regarding Intel's products, including how, if at all, they were comparable.

**Paragraph 183**:  This paragraph merely attempts to connect "demand for ***transceivers***" to "demand for basebands."  And the only evidence he cites in support is evidence that "each of Intel's accused transceivers function in conjunction with, and are sold in conjunction with, an Intel baseband signal processor," Ex. 1, Benoit Rpt., ¶183; that is merely evidence of correlation, not causation—i.e., it does not demonstrate which chip drove sales of the other.  Moreover, Mr. Benoit admits that the accused down-conversion feature of the ***receiver*** is only one feature of the transceiver chips, which include both a receiver and transmitter features. Ex. 2, Benoit Dep. at 245:21-247:6.  So even if Mr. Benoit had demonstrated that the transceiver chips drove sales of baseband chips (he has not), it still would not show that the accused down-conversion feature on the receiver portion of the transceiver chip is the feature of the transceiver chips that allegedly drove sales of the separate baseband chips.

Accordingly, Mr. Benoit has no evidence that the accused down-conversion feature in the receiver portion of the transceiver chip "is what motivates consumers to buy" Intel's baseband chip, so Mr. Benoit's opinion that Intel owes royalties on baseband chips should be excluded.

Dated:  October 28, 2022

Respectfully submitted,

*/s/ J. Stephen Ravel*

Michael J. Summersgill (admitted *Pro Hac Vice*)
Sarah B. Petty (admitted *Pro Hac Vice*)
Harry Hanson (admitted *Pro Hac Vice*)
Samuel C. Leifer (admitted *Pro Hac Vice*)
Alicia Coneys (admitted *Pro Hac Vice*)
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts 02109
T (617) 526-6000
michael.summersgill@wilmerhale.com
sarah.petty@wilmerhale.com
harry.hanson@wilmerhale.com
samuel.leifer@wilmerhale.com
alicia.coneys@wilmerhale.com

J. Steven Ravel
KELLY HART & HALLMAN LLP
303 Colorado, Suite 2000
Austin, Texas 78701
T (512) 495-6429
steve.ravel@kellyhart.com

James E. Wren
Texas State Bar No. 22018200
1 Bear Place, Unit 97288
Waco, Texas 76798
T (254) 710-7670
james.wren@baylor.edu

Todd Zubler (admitted *Pro Hac Vice*)
Isley M. Gostin (admitted *Pro Hac Vice*)
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
T (202) 663-6636
todd.zubler@wilmerhale.com
isley.gostin@wilmerhale.com

Mary (Mindy) V. Sooter
Wilmer Cutler Pickering Hale and Dorr LLP
1225 17th Street, Suite 2600
Denver, CO 80202
T (720) 274-3135
mindy.sooter@wilmerhale.com

Jason F. Choy (admitted *Pro Hac Vice*)
Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Avenue, Suite 2100
Los Angeles, California 90071
T (213) 443-5300
jason.choy@wilmerhale.com

**ATTORNEYS FOR DEFENDANT
INTEL CORPORATION**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of the foregoing document via electronic mail on October 28, 2022.

*/s/ J. Stephen Ravel*
J. Stephen Ravel
