## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | |
|---|---|
| PARKERVISION, INC. <br><br> Plaintiff, <br><br> vs. <br><br> INTEL CORPORATION <br><br> Defendant. | C.A. No. 6:20-cv-108-ADA <br><br> **JURY TRIAL DEMANDED** <br> PUBLIC VERSION |

## DEFENDANT INTEL CORPORATION'S RESPONSE TO PARKERVISION'S DAUBERT MOTION REGARDING DAMAGES ISSUES

**TABLE OF CONTENTS**

I.  INTRODUCTION ........................................................................................................1

II. BACKGROUND .........................................................................................................1

    A.    Mr. Benoit's Opinion Regarding Damages. .....................................................1

    B.    Dr. Perryman's Response To Mr. Benoit's Opinion. ........................................1

III. ARGUMENT ...............................................................................................................2

    A.    Dr. Perryman's Conclusions Concerning ▮▮▮▮▮▮▮▮▮▮
        ▮▮▮▮▮ Are Reliable And Admissible. ...................................................3

        1.    Dr. Perryman applied established methodology to assess
            economic comparability. ........................................................................3

        2.    Dr. Subramanian's conclusion regarding technological
            comparability of ▮▮▮▮▮▮▮▮ supports Dr. Perryman. .............6

    B.    The Buffalo And ZyXEL Licenses Are Technologically Comparable. ............7

    C.    Dr. Perryman Appropriately Relies On Dr. Subramanian's Conclusions
        Regarding Technological Comparability. .........................................................9

    D.    Dr. Perryman's Analysis Of The Portfolio Valuation Commissioned
        By ParkerVision Itself Is Admissible As A Reasonableness Check. ..............10

    E.    Dr. Perryman's Analysis Of The Infineon Acquisition Is Admissible
        As A Reasonableness Check. .........................................................................12

    F.    ParkerVision's Public Statements About The Value Of Its Patent
        Portfolio Are Admissible As A Reasonableness Check. ................................15

IV. CONCLUSION ..........................................................................................................15

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Albritton v. Acclarent, Inc.*,
   2020 WL 11627275 (N.D. Tex. Feb. 28, 2020) .......................................................................... 13

*Corelogic Information Solutions, Inc. v. Fiserv, Inc.*,
   2012 WL 12897920 (E.D. Tex. Sept. 22, 2012) ........................................................................... 5

*Elbit Systems Land & C4I Ltd. v. Hughes Network Systems, LLC*,
   927 F.3d 1292 (Fed. Cir. 2019) ................................................................................................... 8

*Ericsson Inc. v. D-Link Systems, Inc.*,
   773 F.3d 1201 (Fed. Cir. 2014) ......................................................................................... 5, 6, 12

*Finjan, Inc. v. Secure Computing Corp.*,
   626 F.3d 1197 (Fed. Cir. 2010) ................................................................................................... 3

*GPNE Corp. v. Apple, Inc.*,
   2014 WL 1494247 (N.D. Cal. Apr. 16, 2014) ........................................................................... 13

*Integra Lifesciences I, Ltd. v. Merck KGaA*,
   331 F.3d 860 (Fed. Cir. 2003) ......................................................................................... 6, 13, 14

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
   694 F.3d 51 (Fed. Cir. 2012) ................................................................................................... 3, 7

*Lucent Technologies, Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009) ................................................................................................ 3, 5

*Microchip Technology Inc. v. Aptiv Services US LLC*,
   2020 WL 10503006 (D. Del. Aug. 24, 2020) ............................................................................. 13

*Prism Technologies LLC v. Sprint Spectrum L.P.*,
   849 F.3d 1360 (Fed. Cir. 2017) ................................................................................................... 8

*Rembrandt Wireless Technologies LP v. Samsung Electronics Co.*,
   853 F.3d 1370 (Fed. Cir. 2017) ................................................................................................... 8

*Robocast, Inc. v. Microsoft Corp.*,
   2014 WL 202399 (D. Del. Jan. 16, 2014) ................................................................................. 12

*Vasudevan Software, Inc. v. MicroStrategy Inc.*,
   2013 WL 597655 (N.D. Cal. Feb. 15, 2013) ............................................................................. 14

*Visteon Global Technologies, Inc. v. Garmin International*, Inc.,
   2016 WL 4727476 (E.D. Mich. Sept. 12, 2016) ......................................................................... 5

I.  **INTRODUCTION**

In stark contrast to ParkerVision's Paul Benoit, Intel's damages expert, Dr. Ray Perryman, applies well-established methodology to analyze real-world evidence of the value of the asserted patents. Based on his assessment of that evidence, Dr. Perryman concludes that Mr. Benoit's opinion that Intel should pay ▮▮▮▮ for a license to the six asserted patents is grossly inflated and unreasonable. ParkerVision now moves to exclude Dr. Perryman's conclusions regarding two of ParkerVision's three patent licenses, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and the real-world evidence that Dr. Perryman uses to demonstrate that Mr. Benoit's unsupported calculations are unreasonable. Dkt. 195 ("Mot."). None of ParkerVision's arguments support exclusion because Dr. Perryman applied a well-established comparability analysis as his methodology, and then used real-world evidence as a check to confirm his conclusion that Mr. Benoit's opinion is unreasonable.

II.  **BACKGROUND**

A.  **Mr. Benoit's Opinion Regarding Damages.**

ParkerVision's damages expert, Paul Benoit, opines that Intel should pay ▮▮▮▮ in damages. Ex. 1, Benoit Rpt., ¶ 6.[1] He opines that ParkerVision's asserted patents supposedly created ▮▮▮ of the "economic value" of the Intel receiver technology at issue, while all of the technology that Intel (and Infineon before it) developed created ▮▮▮ of the "economic value" of the receiver technology at issue. *Id.*, Ex. F.1. Mr. Benoit does not base his analysis on any of the patent licenses or agreements produced by ParkerVision ▮▮▮.

B.  **Dr. Perryman's Response To Mr. Benoit's Opinion.**

Dr. Perryman considers extensive real-world evidence bearing on the value of the asserted patents and opines that Mr. Benoit's opinion is unreasonable in light of that evidence. Specifically, Dr. Perryman identifies three agreements that are comparable to a hypothetical

---

[1] All exhibits are attached to the Declaration of Harry Hanson, filed concurrently herewith.

1

license between ParkerVision and Intel to the asserted patents: (1) a 2016 patent license and settlement agreement between ParkerVision and Samsung for a one-time payment of 

Dr. Perryman also identifies a number of other real-world data points showing that Mr. Benoit substantially overvalues ParkerVision's alleged contribution to the value of the Products-At-Issue, and substantially undervalues Intel's contributions. Those data points include Intel's 2011 acquisition of Infineon, which included ▮ patents as well as Infineon's ongoing wireless business; ParkerVision's only two other patent licenses, one-time payments from Buffalo ▮ and from ZyXEL for ▮ and valuations of ParkerVision's patent portfolio in its SEC filings and by an independent third-party called IP Capital Group ("ipCG") that ParkerVision retained in 2011.

## III. ARGUMENT

ParkerVision seeks to preclude Dr. Perryman from relying on most of the evidence that forms the basis for his conclusions, despite the fact that his methodology is fully consistent with settled patent damages law. This brief first addresses ParkerVision's arguments concerning Dr. Perryman's reliance on comparable license agreements and then addresses ParkerVision's complaints regarding the evidence Dr. Perryman has relied on as a reasonableness check.[3] ParkerVision's complaints provide no basis whatsoever for outright exclusion and, at most, go the weight of the evidence. ParkerVision's motion should be denied.

---

[2] ParkerVision has not moved to exclude Dr. Perryman's reliance on the Samsung agreement.
[3] While this is different from the order used in ParkerVision's brief, this is the order in which Dr. Perryman addresses the evidence and thus is a more logical way to assess his conclusions.

A.   **Dr. Perryman's Conclusions Concerning ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ Are Reliable And Admissible.**

Dr. Perryman identifies ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ related to down-conversion—the same technology ParkerVision alleges infringes the asserted patents. He then analyzes their economic and technological comparability to a hypothetical license to the asserted patents and explains how ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ for those agreements demonstrate that Mr. Benoit's ▮▮▮▮▮▮▮ damages claim for ParkerVision's six asserted patents is unreasonable. Ex. 2, Perryman Rpt., ¶¶14, 204-210, 211-219.

1.   **Dr. Perryman applied established methodology to assess economic comparability.**

ParkerVision erroneously argues that Dr. Perryman's economic comparability analysis should be excluded because the amounts paid for ▮▮▮▮▮▮▮▮ allegedly do not reflect the "economic value" of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and Dr. Perryman did not specifically quantify the downward adjustments required to account for differences between ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ and a hypothetical license to the asserted patents. Mot. at 8-9.

*First*, Dr. Perryman assesses the economic comparability of ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ using methodology repeatedly endorsed by the Federal Circuit. While there is no set list of factors that make a prior agreement economically comparable to the hypothetical negotiation, factors found to be relevant include the type of agreement (e.g., one-way transfer/pure patent agreement), whether the agreement covers the life of the patents, the parties' relationship, the relative negotiating strength and market position of the parties, the time period of the agreement, and the type of payment required. *See, e.g.*, *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1329 (Fed. Cir. 2009); *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1211 (Fed. Cir. 2010); *LaserDynamics, Inc. v. Quanta Computer, Inc.*,

694 F.3d 51, 80 (Fed. Cir. 2012). Dr. Perryman assesses each of these factors,[4] so his methodology is legally sound and his conclusion is admissible.

*Second*, ParkerVision argues that, prior to entering ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, Intel did not perform an unspecified "economic evaluation" of the benefits of the technology in the agreements, citing testimony from Keith Gray.[5] Mot. at 8-9. ParkerVision then argues that, because Intel did not at the time perform such an "economic evaluation," it is "not possible to measure or opine" on economic comparability because the amounts ▮▮▮▮▮▮▮▮ allegedly "have *no* relationship to any economic benefits or economic value pertaining to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* (emphasis in original).

As an initial matter, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *are* the economic value of the patent rights granted in those agreements. ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 3, Gray Dep. at 23:20-24:13.[6]

Moreover, ParkerVision cites no legal authority requiring Intel, ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ to have performed this unspecified "economic evaluation"

---

[4] For ▮▮▮▮▮▮▮▮▮▮▮▮, Dr. Perryman considers the type of agreement, the parties' relationship, the parties' negotiating strength, and the timeframe of the agreement as compared to the date of the hypothetical negotiation and explains how to adjust for each factor (downward for all but the timeframe, which is neutral) to account for economic comparability. Ex. 2, Perryman Rpt., ¶¶212, 219. For ▮▮▮▮▮▮▮▮▮▮, Dr. Perryman considers the type of agreement, the parties' negotiating strength, and the timeframe of the agreement and explains how to adjust for each factor (downward for all but the timeframe, which is neutral) to account for economic comparability. *Id.*, ¶¶206, 208-210. Dr. Perryman nonetheless conservatively uses the full amount ▮▮▮▮▮▮▮▮▮▮ as a data point to show that Mr. Benoit's opinion is unreasonable. Ex. 2, Perryman Rpt., ¶14.

[5] ParkerVision omits key parts of Mr. Gray's testimony about how Intel values patent licensing opportunities. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[6] Emphases are added, unless otherwise noted.

of technological benefits as a prerequisite to economic comparability. To the contrary, the first case ParkerVision cites—*Ericsson Inc. v. D-Link Sys.*, 773 F.3d 1201 (Fed. Cir. 2014)—lists multiple potential considerations relevant to economic comparability but does not say that any given one is required. *Id.* at 1227. The second case ParkerVision cites—*Corelogic Info Sol'ns, Inc. v. Fiserv, Inc.*, 2012 WL 12879720 (E.D. Tex. Sept. 22, 2012)—***denied*** a motion to exclude expert opinions regarding two allegedly comparable settlement agreements, and merely noted that the party offering the licenses at trial must "establish its technical and economic comparability prior to introducing the royalty amount to the jury." *Id.*, at *3. Dr. Perryman's conclusions on the economic comparability of ▮ are entirely consistent with both cases.

***Third***, ParkerVision argues that Dr. Perryman's conclusions about ▮ ▮ should be excluded because he does not quantify the impact of the downward adjustments needed to account for economic comparability. Mot. at 9-12. But the law does not require precise quantification of adjustments for economic comparability. *See Lucent*, 580 F.3d at 1325 ("[A]ny reasonable royalty analysis necessarily involves an element of approximation and uncertainty."); *see also Visteon Global Techs., Inc. v. Garmin Int'l*, 2016 WL 4727476, at *11 (E.D. Mich. Sep. 12, 2016) ("The law does not require Garmin to demonstrate with any degree of mathematical or economic precision the impact that these differences would have on the value of a reasonable royalty."). Moreover, Dr. Perryman concluded that economic comparability required ***downward*** adjustments to both ▮ ▮ but still used the full value of those agreements to be conservative ***in ParkerVision's favor***. Finally, the fact that precise quantification is not required is particularly true here, given the orders of magnitude in difference between Mr. Benoit's proposed ▮ ▮ royalty for a license to the asserted down-conversion patents and ▮ ▮

5

███████ *See, e.g.*, *Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d 860, 871 (Fed. Cir. 2003), *vacated on other grounds*, 545 U.S. 193 (2005) ("A $15,000,000 award figure to compensate for infringement of only some of Telios' patents before Integra's acquisition seems unbalanced in view of the overall acquisition price.").

At most, ParkerVision's arguments go to the weight of Dr. Perryman's economic comparability analysis of ███████████████████.[7] *Ericsson*, 773 F.3d at 1227 ("[T]he fact that a license is not perfectly analogous generally goes to the weight of the evidence, not its admissibility."). They are certainly no basis for exclusion. *Id.*

### 2. Dr. Subramanian's conclusion regarding technological comparability of ███████████ supports Dr. Perryman.

ParkerVision argues that Dr. Subramanian's technical analysis that ███████████ ██████ offer "similar" advantages to the purported advantages claimed in ParkerVision asserted patents does not support Dr. Perryman's conclusion that ███████████████ offer "greater" advantages than the ParkerVision asserted patents. Mot. at 10. But the differences between Dr. Subramanian's ***technical*** analysis and Dr. Perryman's ***economic*** assessment is classic cross-examination; it does not remotely support exclusion.

Contrary to ParkerVision's assertion, Dr. Perryman's conclusion is supported by Dr. Subramanian's conclusion that the asserted patents do not in fact provide the benefits

---

[7] ParkerVision also challenges Dr. Perryman's conclusion that ███████████████████ ████████████████████████████████████████████████████████████████████████████████ ██████████████████████ on the basis that all patent purchase agreements are lump sums. Mot. at 12. ParkerVision misses the point—████████████████████████████████████ ████████████████████████████████████████████. *See* Ex. 3, Gray Dep. at 23:1-17. ██████████████ is simply one of many agreements that Dr. Perryman cited as evidence of █████████████████████████████████████████████. *See* Ex. 2, Perryman Rpt., ¶96 █████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ Moreover, Dr. Perryman acknowledges that a ███████████████████████████ more rights than a nonexclusive license such that the value of the purchase agreement should be adjusted downward to be more comparable to a non-exclusive license. *Id.*, ¶219.

6

ParkerVision claims they provide. Dr. Subramanian explains that the claim by ParkerVision's technical expert, Dr. Steer, that the asserted patents allow the removal of SAW filters is contradicted by the record evidence. Ex. 4, Sub. Reb. Rpt., ¶1017. Dr. Subramanian further explains that at least one ▮▮▮▮▮ states that it can provide the same types of benefits as Dr. Steer claims the asserted patents provide, including "fewer filtering components." *Id.*, ¶1018. Dr. Perryman cites and relies on those portions of Dr. Subramanian's report in support of his conclusion that the "purported advantages of the technology covered by the patents in the ▮▮▮ agreement are greater than the advantages allegedly conferred by the patents-in-suit in this matter." Ex. 2, Perryman Rpt., ¶207. Dr. Perryman's economic conclusion is thus fully supported by Dr. Subramanian's technical conclusion that the asserted patents do not provide the benefits Dr. Steer claims they provide.

### B. The Buffalo And ZyXEL Licenses Are Technologically Comparable.

Mr. Benoit—ParkerVision's damages expert—admitted at his deposition that he had not reviewed two of the three ParkerVision licenses that grant rights *to asserted patents*. Ex. 5, Benoit Dep. at 195:21-196:2, 203:21-23, 278:11-13. In a transparent effort to paper over this major oversight, ParkerVision now erroneously seeks to exclude Dr. Perryman's conclusions regarding those two agreements with Buffalo and ZyXEL.

*First*, ParkerVision's assertion that Dr. Perryman "conceded" that the Buffalo and ZyXEL licenses are not technologically comparable is wrong and misses the point. Mot. at 12-13. To the contrary, Dr. Perryman explained that the Buffalo and ZyXEL licenses ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 6, Perryman Dep. at 213:10-214:6 ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *see also* Ex. 2, Perryman Rpt., ¶¶149-151, 155-157. The Federal Circuit has repeatedly held that prior licenses to the asserted patents are the most meaningful comparables when assessing the amount of a reasonably royalty. *LaserDynamics*,

7

694 F.3d at 79 ("Actual licenses to the patented technology are highly probative as to what constitutes a reasonable royalty for those patent rights because ***such actual licenses most clearly reflect the economic value of the patented technology in the marketplace***."); *Rembrandt Wireless Techs. LP v. Samsung Elec. Co.*, 853 F.3d 1370, 1381-82 (Fed. Cir. 2017) ("The Blackberry settlement agreement was relevant here because it contained a license of the very patents Samsung was found to infringe.").[8]

***Second***, ParkerVision is also incorrect that Dr. Perryman "admitted" that the Buffalo and ZyXEL licenses are not economically comparable. Mot. at 13. To the contrary, in response to a question ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Ex. 6, Perryman Dep. at 213:10-214:6; *see also* Ex. 2, Perryman Rpt., ¶427. Moreover, the Federal Circuit has allowed consideration of patents licenses included in settlement agreements entered into by the patent holder where, as here, the licenses conveyed rights to the asserted patents and the agreements were otherwise comparable. *See Elbit Systems Land & C4I Ltd. v. Hughes Network Sys., LLC*, 927 F.3d 1292, 1299-1301 (Fed. Cir. 2019); *Rembrandt*, 853 F.3d at 1381-82; *Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1370-71 (Fed. Cir. 2017) ("The district court had an adequate basis for admitting the AT&T Settlement Agreement. That Agreement covered the patents at issue here …").

***Finally***, ParkerVision is wrong that the Buffalo and ZyXEL licenses are not comparable because they are further removed from the August 2013 hypothetical negotiation than other

---

[8] ParkerVision selectively cites Dr. Perryman's deposition testimony; at most, Dr. Perryman's full answer shows that he recognized that the two agreements were not comparable in all respects. Mot. at 12-13. Dr. Perryman accounted for those differences by making appropriate adjustments, so there is no basis for exclusion. Ex. 2, Perryman Rpt., ¶¶149-151, 155-157.

8

licenses that Dr. Perryman distinguishes as too far removed from that date. The agreements Dr. Perryman distinguishes *predate* the issuance of any of the asserted patents (i.e., Symbol in 1999) or all but one of the asserted patents (i.e., VIA in December 2007) while the Buffalo and ZyXEL licenses ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.[9] Ex. 2, Perryman Rpt., ¶¶160, 172. Dr. Perryman is not seeking to "have it both ways," as ParkerVision argues. Mot. at 13. Rather, he explains how the Buffalo and ZyXEL agreements, which were entered into *after* the patents-in-suit were granted are comparable, while the pre-patent issuance agreements Mr. Benoit relies on are not. *Id.* ¶¶149, 155, 160, 172.

### C. Dr. Perryman Appropriately Relies On Dr. Subramanian's Conclusions Regarding Technological Comparability.

As noted above, ParkerVision's damages expert, Mr. Benoit, relies on opinions from ParkerVision's technical expert, Dr. Steer, to support his opinion that the asserted patents allegedly allow the removal of certain "SAW" filters from the Products-At-Issue and mobile devices that use the Products-At-Issue. Ex. 1, Benoit Rpt., ¶¶114, 125, 205. Mr. Benoit estimates the alleged cost savings (to Intel customers) from the removal of SAW filters at ▓▓▓ ▓▓▓▓▓▓▓ and uses that estimate, plus over ▓▓▓▓▓▓▓ in "incremental profit" from unaccused baseband chips, as inputs to his calculation of a ▓▓▓▓▓▓▓ royalty for Intel's alleged use of the asserted patents. *See id.*, Ex. C.1, F.1.

ParkerVision incorrectly seeks to exclude two conclusions Dr. Perryman offers in response to Mr. Benoit's damages calculation on the basis that those conclusions are beyond Dr. Perryman's expertise and not supported by Dr. Subramanian's technical analysis.

Dr. Perryman's conclusion that the "patents-in-suit provide minimal, if any, noticeable benefits" is directly supported by the same portions of Dr. Subramanian's technical analysis

---

[9] Dr. Perryman also distinguishes the Symbol and VIA agreements on multiple other bases beyond their date, including that both were ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ that the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ and ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Ex. 2, Perryman Rpt., ¶¶159-177.

9

discussed above (at pages 6-7) that the asserted patents did not enable the removal of SAW filters. *See* Ex. 4, Sub. Reb. Rpt., ¶¶76-83, 903-977.

Dr. Perryman discloses multiple bases for disputing Mr. Benoit's opinion that the asserted patents allegedly drive demand for unaccused baseband chips, including sales data, deposition testimony from witnesses with relevant knowledge,[10] and conversations with Dr. Subramanian—none of which ParkerVision seeks to exclude. Ex. 2, Perryman Rpt., ¶¶293, 295, 298.

ParkerVision nonetheless argues that Dr. Perryman should be precluded from considering his extensive experience when responding to Mr. Benoit's opinion that the asserted patents drive demand for unaccused baseband chips. ParkerVision is incorrect that Dr. Perryman offered a "technical opinion[] relating to baseband technology" at his deposition. Mot. at 15. To the contrary, Dr. Perryman made clear that he was explaining his observations as an economist who has studied the market for cellular products over a period of many years. *See* Ex. 6, Perryman Dep. at 178:6-17, 178:24-179:20.

### D. Dr. Perryman's Analysis Of The Portfolio Valuation Commissioned By ParkerVision Itself Is Admissible As A Reasonableness Check.

In 2011—shortly before the 2013 hypothetical negotiation—ParkerVision commissioned a royalty-based assessment of the value of its patent portfolio if licensed to players in the cellular market—the same market at issue in this case—from an independent third-party, ipCG. At the time, ParkerVision's portfolio included the two asserted patents that issued before the hypothetical negotiation and related patents. IpCG concluded that 

Ex. 7, ipCG Valuation (PV00416465) at 1, 3.

---

[10] For example, Dr. Perryman cites the testimony of Kevin Constantine, who was responsible for Intel's sales of cellular transceivers and baseband chips to Apple. Ex. 2, Perryman Rpt., ¶295.

10

Dr. Perryman explains that ParkerVision would have been aware of ipCG's 2011 valuation at a hypothetical negotiation with Intel in 2013 and that the 2011 valuation "provides additional evidence that Mr. Benoit's concluded reasonable royalty in this matter is highly unreasonable" because it is ███████████████████████████████████ ██████████ Ex. 2, Perryman Rpt., ¶258. Tellingly, ParkerVision's expert Mr. Benoit admitted at his deposition that he was not aware of ipCG's analysis prior to reading Dr. Perryman's rebuttal report. Ex. 5, Benoit Dep. at 162:11-15. None of ParkerVision's arguments support exclusion of Dr. Perryman's conclusions regarding the ipCG analysis.

***First***, ParkerVision argues that Dr. Perryman's observation that ipCG applied ████ ████████████████████████████████████████████████████████████ is "contradicted by the facts" because ParkerVision's auditor at the time, ████████████ ████████████████████████████████████████████████████████████████ Mot. at 6. But all PwC asked was ████████████████████████████████ ██████ Ex. 8, PwC Comments (CONF-PV00261898) at 4. Moreover, ipCG delivered its valuation to ParkerVision ████████████████████████████████████████ ██████ and there is no indication that ipCG changed its analysis before delivering the final report two days after receiving PwC's comments. *Compare* Ex. 9, Cover Email Attaching PwC Questions (CONF-PV00261897) (March 15, 2011), *with* Ex. 7, ipCG Valuation (PV00416465) (March 17, 2011). In any event, ParkerVision is incorrect that Dr. Perryman admitted that "his report got it wrong" regarding the royalty rates ipCG applied. Mot. at 6. To the contrary, Dr. Perryman notes in his report that ████████████████████████████████ ██████████ (Ex. 2, Perryman Rpt., ¶257) and merely acknowledged the same at his deposition, Ex. 6, Perryman Dep. at 262:21-263:13.

***Second***, ParkerVision argues that Dr. Perryman is incorrect that ipCG's valuation assumed validity and enforcement of ParkerVision's patents. Mot. at 6. As an initial matter,

11

Dr. Perryman's analysis of the ipCG valuation was not premised on any such assumption and he did not state in his report or the deposition testimony ParkerVision cites that it was. In any event, ParkerVision's extreme position would preclude reliance on any real-world agreement or assessment in which validity and infringement were not presumed. But the Federal Circuit routinely permits the use of such evidence. *See Ericsson*, 773 F.3d at 1228 ("Making real world, relevant licenses inadmissible on the grounds D-Link urges would often make it impossible for a patentee to resort to license-based evidence.").

**Third**, ParkerVision's argument that only two of the six asserted patents had issued as of the date of the ipCG valuation does not impact Dr. Perryman's conclusions because the same is true of the hypothetical negotiation—only two of the six asserted patents had issued as of August 2013. Ex. 2, Perryman Rpt., ¶¶39, 230, 315. The ipCG valuation thus accounts for the same number of asserted patents as had issued before the hypothetical negotiation.

**Fourth**, ParkerVision argues that Dr. Perryman "provides no opinion or explanation for why ipCG's valuation" is "comparable or indicative of the value of the patents-in-suit." Mot. at 7. In fact, Dr. Perryman provides multiple reasons, including that it ▌

▌ Ex. 2, Perryman Rpt., ¶¶253-258.

At most, ParkerVision's arguments about the ipCG valuation go to the weight of Dr. Perryman's conclusions. There is no basis to exclude them. *See, e.g.*, *Robocast, Inc. v. Microsoft Corp.*, 2014 WL 202399, at *3 (D. Del. Jan. 16, 2014) ("While there is a question regarding the discounts applied to the valuation, the valuation itself should not be excluded.").

### E. Dr. Perryman's Analysis Of The Infineon Acquisition Is Admissible As A Reasonableness Check.

Dr. Perryman's analysis of the Infineon acquisition and the Infineon patents acquired as part of that acquisition provides important context that will help the jury understand why

Mr. Benoit's opinion that Intel would have paid ▉▉▉▉ for a license to six patents allegedly related to one aspect of the Products-At-Issue is unreasonable. It is well settled that damages experts may consider real-world evidence as a "check" on the reasonableness of conclusions about a reasonable royalty.[11] Like the experts in *GPNE* and *Microchip Tech.*, Dr. Perryman's analysis of the Infineon acquisition demonstrates that Mr. Benoit's damages opinion is unreasonable in light of the real-world evidence in the record. Ex. 2, Perryman Rpt., ¶220. That is precisely the type of reasonableness check that Courts routinely allow.

*First*, contrary to ParkerVision's argument (Mot. at 1), Dr. Perryman's analysis of Intel's acquisition of Infineon is directly tied to the facts of this case. Intel acquired the line of Products-At-Issue (the SMARTi™ products) from Infineon along with ▉▉▉▉ related to the cellular technology used in the acquired SMARTi™ line of products. Dr. Subramanian confirmed for Dr. Perryman that the acquired patents relate to the Products-At-Issue and identified 11 specific examples that relate to the receiver technology in the Products-At-Issue. Ex. 4, Sub. Reb. Rpt., ¶¶86-87. Dr. Perryman's analysis of the Infineon acquisition will help the jury assess the reasonableness of Mr. Benoit's entirely unfounded opinions that ParkerVision's six asserted patents purportedly created ▉▉▉ of the value of technology while the ▉▉▉▉, entire line of products, and entire research and development group of ▉▉▉ ▉▉▉ that Intel acquired from Infineon created only ▉▉ of the value. Ex. 1, Benoit Rpt., Ex. F.1. This is precisely the type of real-world evidence that is appropriate in response to a damages claim. *Integra*, 331 F.3d at 871 ("A $15,000,000 award figure to compensate for

---

[11] *See, e.g.*, *Albritton v. Acclarent, Inc.*, 2020 WL 11627275, at *12 (N.D. Tex. Feb. 28, 2020) ("Given that Inglish is not offering or characterizing the $500 assignment as a comparable license, he is not required to make an analysis of the circumstances of the assignment and those of a hypothetical negotiation."); *GPNE Corp. v. Apple, Inc.*, 2014 WL 1494247, at *10 (N.D. Cal. Apr. 16, 2014) (denying motion to exclude expert testimony using settlement licenses as a "check" on reasonableness of a royalty calculation); *see also Microchip Tech. Inc. v. Aptiv Servs. US LLC*, 2020 WL 10503006, at *1 (D. Del. Aug. 24, 2020) (denying motion to exclude manufacturing cost as "cross-check" for reasonable royalty).

infringement of only some of Telios' patents … seems unbalanced in view of the overall acquisition price.").

**Second**, ParkerVision misses the point when it argues that the Infineon acquisition is not a "comparable" transaction to a license to the asserted patents. Mot. at 1. Dr. Perryman does not opine that Intel would have considered the acquisition of an entire company comparable to a license to six patents. Rather, Dr. Perryman opines that Mr. Benoit's damages opinion is unreasonable because the value he attributes to a *license* to the six asserted patents (that PV never successfully commercialized in cellular products) is ▇▇▇▇▇▇▇▇ higher than what Intel paid to *acquire* patents related to market-ready and proven technology.

**Third**, Dr. Perryman's analysis of the patents Intel acquired from Infineon is appropriate as a reasonableness check. ParkerVision argues that Dr. Perryman's analysis should be excluded because he does not account for potential differences in value between the ▇▇ patents Intel acquired from Infineon. But Dr. Perryman is not using his calculations of the amount Intel paid per patent as a measure of a specific reasonable royalty. Rather, he is contrasting the amount Intel paid to acquire all rights to over ▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇ with Mr. Benoit's opinion about how much Intel allegedly would have been willing to pay for a non-exclusive license to the six asserted patents. The jury should be permitted to consider these data points, and Dr. Perryman's analysis is more than sufficient because either real-world metric Dr. Perryman calculates demonstrates that ParkerVision's damages demand is unreasonable ▇▇▇▇▇▇▇▇. *Integra*, 331 F.3d at 871; *see also Vasudevan Software, Inc. v. MicroStrategy Inc.*, 2013 WL 597655, at *1 (N.D. Cal. Feb. 15, 2013) ("[I]nformation about the value of the accused products and their other features is obviously relevant.").

**Fourth**, ParkerVision argues that Dr. Perryman did not adjust his analysis of the Infineon acquisition to account for the difference between fair market value and a reasonable

royalty. But Dr. Perryman acknowledges and accounts for the differences between the Infineon acquisition and a hypothetical license to the asserted patents and is not offering one as a comparable transaction to the other. Ex. 2, Perryman Rpt., ¶¶224-228. Dr. Perryman's analysis of the Infineon acquisition is therefore sufficient for the purpose for which it is offered—a reasonableness check on Mr. Benoit's opinion.

### F. ParkerVision's Public Statements About The Value Of Its Patent Portfolio Are Admissible As A Reasonableness Check.

Finally, Dr. Perryman's assessment of patent portfolio valuations in ParkerVision's SEC filings that are ▌▌▌▌▌▌▌▌ ParkerVision seeks in this case for a license to six of those patents is admissible as a reasonableness check on Mr. Benoit's damages opinion. ParkerVision argues that Dr. Perryman's conclusion regarding its own public statements to investors should be excluded based on the difference between "book value" of patents and the "market value" of a license to those patents. Mot. at 4-5. ParkerVision cites no caselaw supporting this bold argument. To the contrary, that difference provides no basis to exclude Dr. Perryman's use of those valuations as a reasonableness check where the difference between the two ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

Moreover, Dr. Perryman acknowledges the difference between book value of owning a portfolio of patents and the market value of a non-exclusive license to a subset of that portfolio. Ex. 2, Perryman Rpt., ¶¶249-252; Ex. 6, Perryman Dep. at 268:8-269:15. ParkerVision is free to explore the impact of those differences on cross examination at trial, but none of those differences preclude Dr. Perryman's use of ParkerVision's statements to investors as a reasonableness check on Mr. Benoit's inflated damages theory.

## IV.   CONCLUSION

For the foregoing reasons, ParkerVision's *Daubert* motion should be denied.

Dated:  November 15, 2022

Michael J. Summersgill (admitted *Pro Hac Vice*)
Sarah B. Petty (admitted *Pro Hac Vice*)
Harry Hanson (admitted *Pro Hac Vice*)
Samuel C. Leifer (admitted *Pro Hac Vice*)
Alicia Coneys (admitted *Pro Hac Vice*)
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
T (617) 526-6000
michael.summersgill@wilmerhale.com
sarah.petty@wilmerhale.com
harry.hanson@wilmerhale.com
samuel.leifer@wilmerhale.com
alicia.coneys@wilmerhale.com

Todd Zubler (admitted *Pro Hac Vice*)
Isley M. Gostin (admitted *Pro Hac Vice*)
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
T (202) 663-6636
todd.zubler@wilmerhale.com
isley.gostin@wilmerhale.com

Mary (Mindy) V. Sooter
WILMER CUTLER PICKERING HALE AND DORR LLP
1225 17th Street, Suite 2600
Denver, CO 80202
T (720) 274-3135
mindy.sooter@wilmerhale.com

Jason F. Choy (admitted *Pro Hac Vice*)
WILMER CUTLER PICKERING HALE AND DORR LLP
350 South Grand Avenue, Suite 2400
Los Angeles, California 90071
T (213) 443-5300
jason.choy@wilmerhale.com

Respectfully submitted,

*/s/ J. Stephen Ravel*

J. Stephen Ravel
KELLY HART & HALLMAN LLP
303 Colorado, Suite 2000
Austin, Texas 78701
T (512) 495-6429
steve.ravel@kellyhart.com

James E. Wren
Texas State Bar No. 22018200
1 Bear Place, Unit 97288
Waco, Texas 76798
T (254) 710-7670
james.wren@baylor.edu

*Attorneys for Defendant Intel Corporation*

16

**CERTIFICATE OF SERVICE**

    I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of the foregoing document via electronic mail on November 15, 2022.

                                                     */s/ J. Stephen Ravel*
                                                     J. Stephen Ravel