UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| **PARKERVISION, INC.,**<br><br>Plaintiff<br><br>v.<br><br>**INTEL CORPORATION,**<br><br>Defendant | **Case No. 6:20-cv-00108-ADA**<br><br>**JURY TRIAL DEMANDED** |

<u>**PLAINTIFF PARKERVISION, INC.'S RESPONSE IN OPPOSITION TO DEFENDANT INTEL CORPORATION'S MOTION TO EXCLUDE CERTAIN OPINIONS AND TESTIMONY OF PAUL C. BENOIT**</u>

**TABLE OF CONTENTS**

<b><u>Page</u></b>

I.    INTRODUCTION ............................................................................................... 1

II.   LEGAL STANDARD ......................................................................................... 1

III.  ARGUMENT ...................................................................................................... 2

      A.    Mr. Benoit should be permitted to rely on the non-financial terms of ParkerVision's negotiations and license agreements in his analysis............................................................................. 2

      B.    Mr. Benoit's assessment of convoyed sales is proper and *not* based on the Entire Market Value Rule. ............................................ 9

IV.  CONCLUSION ................................................................................................ 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Seating Co. v. USSC Grp., Inc.*,
    514 F.3d 1262 (Fed. Cir. 2008) ................................................................................... 12

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ................................................................................................. 1, 2

*Finjan, Inc. v. Blue Coat Sys.*,
    Case No. 13-cv-03999-BLF, 2015 U.S. Dist. LEXIS 91528
    (N.D. Cal. July 14, 2015) ............................................................................................ 13

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
    318 F. Supp. 1116 (S.D.N.Y. 1970) ....................................................................... 12, 13

*Gree, Inc. v. Supercell Oy*,
    No. 2:19-cv-00070-JRG-RSP, 2020 WL 4057640
    (E.D. Tex. July 20, 2020) ........................................................................................... 11

*Interactive Pictures Corp. v. Infinite Pictures, Inc.*,
    274 F.3d 1371 (Fed. Cir. 2001) ................................................................................... 12

*Rite-Hite Corp. v. Kelley Co., Inc.*,
    56 F.3d 1538 (Fed. Cir. 1995) ............................................................................... 12, 13

*State Indus., Inc. v. Mor-Flo Indus., Inc.*,
    883 F.2d 1573 (Fed. Cir. 1989) ................................................................................... 12

*Watkins v. Telesmith, Inc.*,
    121 F.3d 984 (5th Cir. 1997) ......................................................................................... 2

**Other Authorities**

F.R.E. 702(a) ................................................................................................................ 1, 2

**I.      INTRODUCTION**

Intel's motion seeks to limit Mr. Benoit's royalty opinion based on two arguments. First, Intel argues that Mr. Benoit's reliance on the non-financial terms in ParkerVision's negotiations and license agreements, which reflect running royalty terms and evidence that improvements in transceiver functionality contribute to baseband profits, are not reliable because they are too far removed from the hypothetical negotiation date to be instructive. Second, Intel argues that Mr. Benoit's assessment of convoyed sales based on an apportionment of baseband profits to use of the patents-in-suit violates the entire market value rule ("EMVR"). As discussed below, both of Intel's arguments are unsupported by case law and are without merit.

**II.     LEGAL STANDARD**

An expert witness must be "qualified as an expert by knowledge, skill, experience, training, or education," and the testimony must "help the trier of fact to understand the evidence or to determine a fact in issue[.]" F.R.E. 702(a). The trial judge, in the role of gatekeeper, has the authority to screen expert testimony for compliance with Rule 702 and to regulate and exclude subjects and theories about which an expert may testify. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). Rule 702 requires judges to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* Under Daubert, expert testimony is admissible only if the proponent demonstrates that: (1) the expert is qualified; (2) the evidence is relevant to the suit; and (3) the evidence is reliable. *See*

*Watkins v. Telesmith, Inc.*, 121 F.3d 984, 988-90 (5th Cir. 1997). Rule 702's requirement that expert testimony "assist the trier of fact to understand the evidence or to determine a fact in issue" is primarily a relevance consideration. *Daubert*, 509 U.S. at 591.

### III. ARGUMENT

**A.  Mr. Benoit should be permitted to rely on the non-financial terms of ParkerVision's negotiations and license agreements in his analysis.**

Through an inaccurate and incomplete recitation of law and facts, Intel seeks to exclude factual evidence from the jury's consideration reflecting the willingness of ParkerVision and its licensees to enter into running royalty agreements, as well as evidence showing that transceivers drove additional baseband profits. Without citing any case law specifically addressing the issue of whether such *non-financial* elements of a license agreement's structure require the same level of scrutiny regarding technological and economic comparability, Intel presumes that prior court rulings pertaining specifically to royalty rates and calculations extend beyond the royalty amounts to every aspect of the agreement, including the agreement's structure. Intel provides no case law in support of this argument. Moreover, its argument contradicts the opinion of its own damages expert. Instead, Intel misleads the Court by conflating prior rulings regarding financial terms of negotiations and agreements with issues dealing with the structure of negotiations and agreements.

In his report, Mr. Benoit provided the following observations that are pertinent to Intel's motion:

1. The October 12, 1999 Symbol agreement is instructive of the structure of the agreement that would have been entered into between ParkerVision and Intel, but is not instructive of the royalty rate that would have been agreed to by the parties. Ex. 1 at ¶ 152.

2. The December 21, 2007 Via agreement is instructive of the structure of the agreement that would have been entered into between ParkerVision and Intel, but is not instructive of the royalty rate that would have been agreed to by the parties. Ex. 1 at ¶¶ 157-158.

3. ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████" Ex. 1 at ¶ 180.

4. ParkerVision's 1999 negotiations with Qualcomm "reflect greater royalty amounts on sales of integrated basebands than on sales of transceivers, indicating that the ParkerVision's technology contributed to revenues and profits of the integrated baseband products beyond the transceiver component." Ex. 1 at ¶ 181.

5. "Additionally, the 1999 Symbol Agreement contemplates a royalty that would be paid based on the entire chipset, which includes the baseband, receiver and/or transceiver chips. Likewise, the 2007 VIA agreement contemplates that the

royalty base would have included chipsets, which include the baseband, receiver and/or transceiver chips." Ex. 1 at ¶ 182.

      6. "█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████" Ex. 1 at ¶ 183.

In addition to the above statements—and contrary to Intel's contention that "Mr. Benoit makes no effort to connect the time periods"—Mr. Benoit provides context as to why the importance of ParkerVision's technology would have become even more critical to transceiver functionality as of the August 2013 hypothetical negotiation date than it was during the 1999 negotiations with Qualcomm, the 1999 negotiations with Symbol, and the 2007 negotiation with VIA. Specifically, Mr. Benoit states:

> Symbol manufactures and supplies WLAN devices. The benefit that Symbol would have reasonably anticipated from use of the '551 Patent is the ability to manufacture a smaller chipset at a reduced cost, but with improved performance. This is consistent with the benefit that Intel would have reasonably anticipated from use of the Patents-in-Suit. However, the smaller size of a WLAN device, which at that time was not intended to be used in cellular telephones, did not impart the same benefits as the smaller size of a component of a cellular telephone.

Ex. 1 at ¶ 151.

Further, and contrary to Intel's claim that "Mr. Benoit makes no effort to account for the fundamental economic difference" between the rights contemplated in the Symbol agreement and a bare patent license to the patents-in-suit, Mr. Benoit provided a detailed list of differences between the rights conveyed under the

Symbol agreement and the rights that would have been conveyed under a bare patent license to the patents-in-suit. Ex. 1 at ¶¶ 150-151.

Additionally, as to the increased importance of ParkerVision's patented technology subsequent to the 1999 negotiations with Qualcomm and Symbol and the 2007 negotiations with VIA, Mr. Benoit states:

> The use of the patented technology, as well as smart devices, has changed dramatically since 2007. For example, smartphone shipments in North America made up 17.8% of total mobile shipments in 2007. In 2011, on the other hand, smartphone shipments in North America made up more than 50% of total mobile shipments. Additionally, as of 2011 there were more than 40 different spectrum bands around the globe. Further, industry organizations did not officially adopt LTE for commercial use until 2009 and the first LTE smartphones appeared commercially in 2011. 4G LTE became a foundational technology on which the smartphone revolution was built. As such, the foundational technology on which the smartphone revolution was built would not have been considered at the time the VIA Agreement was entered. Additionally, other connected mobile devices, such as connected tablets and smartwatches, did not exist until later in time. As a result, the full extent of the benefits from use of ParkerVision's technology in a 4G LTE environment discussed throughout this report would not have been considered a potential market for ParkerVision's patented technology at the time the VIA Agreement was entered.

Ex. 1 at ¶ 158.

Thus, Mr. Benoit established a nexus between the evidentiary observations in the 1999 negotiations with Qualcomm and Symbol to the August 2013 hypothetical negotiation date. Specifically, Mr. Benoit showed that, as of 1999, Qualcomm and Symbol acknowledged that improvements in transceiver functionality contributed to baseband profits, that such conditions continued to exist through 2007 as reflected in the structure of the VIA agreement, and that such conditions ███████████████████████████████████████

███████████████████████████████████

███████. Though Intel's motion relies heavily on the district court's decision in ParkerVision's litigation against Qualcomm, Intel does not indicate whether ParkerVision highlighted such a nexus to the district court in that matter, or whether Mr. Benoit's report in that matter contained the same evidence as to the increased importance of the ParkerVision's technology as proffered in the current case.

Indeed, Intel fails to provide context regarding the extent of Mr. Benoit's reliance on the Symbol agreement and 1999 Qualcomm negotiations in ParkerVision's litigation against Qualcomm and whether that reliance is similar in the present matter. With regard to the Symbol agreement, Mr. Benoit relied on the royalty rate reflected in the agreement to inform the rate that would have been agreed to between ParkerVision and Qualcomm. Ex. 2 at 87:18-20 (stating that, as a result of the district court's decision, "I could not rely on the rates themselves or a sharing percentage between the parties that underlied those rates."). Although Qualcomm did not challenge Mr. Benoit's reliance on the Symbol agreement—in part because its expert, Mr. Leonard, also considered the agreement to be a relevant observation—the district court chose to "err on the side of caution and exclude Symbol" from evidence at trial, because neither "expert relie[d] on it as central to their opinions in the case." Notably, the district court was not presented with the same challenge in the Qualcomm matter as it is in the present matter— namely, whether the structure, as opposed to the financial terms of the Symbol agreement,

can be relied upon as evidence of a willingness to enter into running royalty rate agreements and evidence that parties to that agreement perceived the technology to provide benefits beyond the transceiver component. Similarly, regarding the 1999 Qualcomm negotiations, Mr. Benoit relied on financial metrics implicit in those negotiations, which indicated that ParkerVision's technology drove at least ███████ ███████████. *See generally* Ex. 3.  In contrast, Mr. Benoit is not relying on any specific magnitude of value reflected in the 1999 negotiations between ParkerVision and Qualcomm in this case. Instead, he is merely citing evidence indicating that Qualcomm perceived ParkerVision's technology to drive additional profits on baseband components. As such, Intel's overly broad characterization of the district court's decision in the ParkerVision/Qualcomm case is misleading and should not be the basis for exclusion in the present matter. In fact, Intel's damages expert, Dr. Perryman, has offered opinions distinguishing between the reliability of the structural terms and financial terms of license agreements. For example, Dr. Perryman states, "████████████████████████████████████████████ ████████████████████████████████████." Ex. 4 at ¶ 95. But Dr. Perryman testified that the only agreements that he considers to be economically comparable to the license that would have been negotiated between ParkerVision and Intel are ████████████████████████████. Ex. 5 at 217:22–218:1. Moreover, with regard to the Buffalo agreement, Dr. Perryman testified that the agreement was not "comparable in all respects," but that it has "some useful indicators" and in particular that it reflects a "lump-sum license." *Id.* at 213:16–214:6. Dr. Perryman

also testified that the Buffalo agreement was "not one of the principal comparables [he] used in developing [his] opinions," but Dr. Perryman believed it was informative "in terms of how the structure of a license would be in a hypothetical negotiation." *Id.* at 220:4–222:3. With regard to the ZyXEL agreement, Dr. Perryman testified that one of the reasons he found it not to be comparable was that the agreement was seven years after the hypothetical negotiation date, yet he felt it was "informative" primarily in the sense of ParkerVision's purported willingness to enter into lump sum agreements—despite a lack of economic comparability. *Id.* at 222:4-21. Finally, Dr. Perryman testified that a comparable license is something "both economically and technically" comparable, but concluded the ZyXEL agreement and ████████████ are "not comparable in the sense of the technical or economical comparability, [but] do give some insight into what the outcome of a hypothetical negotiation is likely to be in terms of lump sum versus running royalty." *Id.* at 223:5–224:9.

Thus, Dr. Perryman's testimony directly contradicts Intel's argument that agreements that are too far removed from the hypothetical negotiation date to be instructive as to the subject royalty rate cannot provide useful evidence of nonfinancial terms. If Intel seeks to offer this type of testimony at trial, ParkerVision should be afforded the same opportunity. Accordingly, the Court should deny Intel's request to exclude Mr. Benoit's use of prior agreements.

### B. Mr. Benoit's assessment of convoyed sales is proper and *not* based on the Entire Market Value Rule.

Intel attempts to conflate Mr. Benoit's assessment of convoyed sales of basebands with the use of the entire market value rule ("EMVR"). In support of its argument, Intel cites language from various cases, each of which addresses requirements for use of the EMVR and none of which addresses the use of convoyed sales when determining a reasonable royalty. Intel's cited cases are therefore inapposite, and, as explained below, Mr. Benoit provides a reliable explanation for implementing the convoyed sales of basebands in his reasonable royalty analysis.

Mr. Benoit's basis for the inclusion of basebands as convoyed sales includes evidence of Qualcomm, Symbol, and VIA (an agreement that Intel does not object to) including  Additionally, Mr. Benoit identified evidence that . Though Intel argues that this relationship is irrelevant , that argument misses the point: the evidence is relevant in showing that transceiver sales drive baseband sales. Further, Mr. Benoit considered the facts and circumstances surrounding . Specifically, Mr. Benoit states:



Ex. 1 at ¶ 183.

Based on the above-stated evidence, Mr. Benoit included basebands as convoyed sales in his royalty analysis. But Mr. Benoit's royalty analysis *neither* includes the entire value of the accused transceivers *nor* the entire value of basebands in his royalty base or his assessment of the royalty rate. Instead, Mr. Benoit's royalty base consists of the number of accused transceiver units sold. Further, to limit his royalty analysis to the benefits attributed to the use of the patents-in-suit, Mr. Benoit apportioned ▉ of the accused transceiver revenue and profit to the receiver functionality and ▉ to transmitter functionality. Similarly, Mr. Benoit apportioned ▉ of baseband revenue and profit to receiver functionality and ▉ to transmitter functionality. He then apportioned ▉

and ▇▇ of transceiver and baseband revenue and profit to contributions by Intel, respectively.[1]

As described above, and contrary to Intel's motion, Mr. Benoit did not use the EMVR. He does not opine that ParkerVision's reasonable royalty damages should be based on the entire market value of either the accused transceivers or basebands. *See, e.g., Lucent*, 580 F.3d at 1336 (the EMVR "allows for the recovery of damages based on the value of an entire apparatus containing several features, when the feature patented constitutes the basis for consumer demand"). Instead, Mr. Benoit's royalty analysis is predicated on apportioned value. Thus, his apportionment is *in*consistent with the use of EMVR. That is, Mr. Benoit's apportionment shows that he is not resorting to the use of the entire market value rule. *See Gree, Inc. v. Supercell Oy*, No. 2:19-cv-00070-JRG-RSP, 2020 WL 4057640 (E.D. Tex. July 20, 2020) (denying motion to exclude damages expert because, even though the expert relied on the defendant's gross revenues, it conducted an apportionment analysis, which "alone makes the entire market value exception inapplicable as it is an alternative to apportionment") (citing *Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp.*, 879 F.3d 1332, 1349 (Fed. Cir. 2018)).

---

[1] ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

Further, "[t]he 'extent of . . . derivative or convoyed sales' is one of the often-cited *Georgia-Pacific* factors relevant to a determination of a reasonable royalty rate." *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1385 (Fed. Cir. 2001) (citing *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)); *see also State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1580-81 (Fed. Cir. 1989) ("The value of collateral sales could be factored into the royalty rate."). Fundamentally, "[a] 'convoyed sale' refers to the relationship between the sale of a patented product and a functionally associated nonpatented product." *Am. Seating Co. v. USSC Grp., Inc.,* 514 F.3d 1262, 1268 (Fed. Cir. 2008). A jury is "entitled to rely on evidence of bundling and sales in determining the proper scope of [a] royalty base." *Interactive Pictures*, 274 F.3d at 1385 (citing *Deere & Co. v. Int'l Harvester Co.*, 710 F.2d 1551, 1559 (Fed. Cir. 1983) (authorizing such an approach as "eminently reasonable")); *cf. Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1548-49 (Fed. Cir. 1995) (allowing recovery of lost profits from the patentee's unpatented components that compete directly with the infringing device and function together with the patented device). Moreover, that convoyed baseband sales affected Mr. Benoit's estimate of the royalty rate here would itself not be "a sufficient reason to nullify [a] jury's award." *Interactive Pictures*, 274 F.3d at 1385. Therefore, that basebands may have had features that were valuable to Intel's customers does not preclude a jury from considering convoyed baseband sales in determining a reasonable royalty—particularly when examining "[t]he effect of

selling the patented specialty in promoting sales of other products of the licensee[.]" *Georgia-Pacific*, 318 F. Supp. at 1120.

The Federal Circuit, however, has cautioned that "[the] issue of royalty base is not to be confused with the relevance of anticipated collateral sales to the determination of a royalty rate." *Rite-Hite*, 56 F.3d at 1549 n.9. Thus, where a noninfringing product is sold together with the accused product, "there must be some evidence or analysis indicating that the [noninfringing product] sales were driven by demand for [the accused product] and not the other way around" to form a royalty *base* for damages." *Finjan, Inc. v. Blue Coat Sys.*, Case No. 13-cv-03999-BLF, 2015 U.S. Dist. LEXIS 91528, at *30-31 (N.D. Cal. July 14, 2015). "Absent such evidence, including a product that does not practice the patent at issue and indisputably has an independent use would overcompensate [the] Plaintiff." *Id.* at *31. But even where the noninfringing product has independent value, convoyed sales are a relevant consideration in the hypothetical negotiation of a reasonable royalty, and expert testimony as to their effect on a royalty *rate* is permissible. *Id.* (citing *Interactive Pictures*, 274 F.3d at 1386); *see also Rite-Hite*, 56 F.3d at 1554-55. Accordingly, the Court should not exclude Mr. Benoit's proffered opinions regarding convoyed sales of basebands, even if those basebands have independent value. Mr. Benoit's opinions are based on market-based facts and an apportionment analysis, and are *not* tied to an application of EMVR. Mr. Benoit's opinions and the bases for those opinions will directly assist the jury's reasonable royalty analysis when considering the convoyed sales of basebands and should not be excluded.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny Intel's motion.

Dated: November 15, 2022                    Respectfully submitted,

*/s/ Raymond W. Mort, III*

Raymond W. Mort, III
Texas State Bar No. 00791308
raymort@austinlaw.com

**THE MORT LAW FIRM, PLLC**
501 Congress Ave, Suite 150
Austin, Texas 78701
Tel/Fax: (512) 865-7950

Of Counsel:
Ronald M. Daignault (*pro hac vice*)*
Chandran B. Iyer (*pro hac vice*)
Jason S. Charkow (*pro hac vice*)*
Scott R. Samay (*pro hac vice*)*
Stephanie Mandir (*pro hac vice*)
Zachary H. Ellis (Texas Bar No. 24122606)
rdaignault@daignaultiyer.com
cbiyer@daignaultiyer.com
jcharkow@daignaultiyer.com
ssamay@daignaultiyer.com
smandir@daignaultiyer.com
zellis@daignaultiyer.com
DAIGNAULT IYER LLP
8618 Westwood Center Drive
Suite 150
Vienna, VA 22182
**Not admitted in Virginia*

**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I hereby certify that on November 15, 2022, a true and correct copy of the foregoing document was forwarded by electronic mail to all counsel of record for Defendant Intel Corporation.

Dated: November 15, 2022                                Respectfully submitted,

                                                                                 */s/ Raymond W. Mort, III*
                                                                                 Raymond W. Mort, III