**THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

PARKERVISION, INC.,

               Plaintiff,

     v.

INTEL CORPORATION,

               Defendant.

Civil Action No. 6:20-cv-00108-ADA

JURY TRIAL DEMANDED

**<u>PARKERVISION, INC.'S MOTIONS IN LIMINE</u>**

TABLE OF CONTENTS

Page

A.  MIL#1 -- Intel's documents, questioning, and argument relating to disparaging statements and allegations about ParkerVision.................................................... 1

B.  MIL#2 -- Prior litigations, ITC, and IPRs.......................................................... 2

C.  MIL# 3 -- Inventor testimony – claim scope, infringement, prior art................................ 4

D.  MIL#4 – Internal ParkerVision criticisms/disagreements .................................... 5

E.  MIL#5 -- Discussions related to proposed chip for LGIT .................................... 5

F.  MIL#6 – Statement by Dale Klotz and Forbes article re ParkerVision............................ 6

G.  MIL#7 -- Dr. Steer's compensation and excluded opinions in other cases ...................... 7

H.  MIL#8 --Undisclosed expert opinions of former Intel engineers ...................... 8

I.  MIL#9 -- Dr. Subramanian late simulations (and underlying data)................................ 9

J.  MIL#10 -- Evidence related to the PMB2407, PMB4402, RF100 and BBA2 ................ 10

K.  MIL# 11 -- ipCapital Group valuation.................................................. 14

L.  MIL#12 -- Allegedly comparable patents.......................................................... 14

M.  MIL# 13 -- Allegedly Comparable Licenses .................................................. 14

N.  MIL#14 – Litigation finance agreement.......................................................... 15

ParkerVision's motions *in limine* seek to exclude things that have no place in this case. Intel does not seek to make this case about relevant facts. Instead, it appears poised to sling mud at ParkerVision and its witnesses, interject new and flawed theories, and devalue ParkerVision's inventions through sleight-of-hand. The numerous exhibits and deposition designations dedicated to these purposes, however, are irrelevant, highly prejudicial, and should be excluded.

### A.    MIL#1 -- Intel's documents, questioning, and argument relating to disparaging statements and allegations about ParkerVision

Intel seeks to admit numerous third-party (hearsay) documents that disparage ParkerVision. None are reliable and most lack foundation. Intel does so hoping to draw the jury's attention away from Intel's willful infringement. But this sideshow has nothing to do with any issue in this case. Throwing mud at ParkerVision to influence the jury is improper and unfairly prejudicial. Intel's use of these documents (and any related argument/questioning) should be precluded under Fed. R. Evid. 401, 402, 403 and/or 802.

Intel seeks to introduce evidence of ParkerVision's stock performance, its fund-raising activities and criticism of ParkerVision in the marketplace.[1]  For instance, certain documents pertain to the "investment fraud" allegations of an investor, MaxTak, that lost money on ParkerVision stock. Ex. 1, 2. But this Court already denied Intel's request for discovery regarding the alleged fraud. Ex. 3. Other documents include disparaging articles, blog posts, or correspondence emanating from the criticisms of short-sellers. Ex. 4 (Asensio claims ParkerVision "tried to defraud investors); Ex. 5 ("well-known shortseller, Manuel Asensio, says…"); Ex. 6 (reporting claims of Farmwald, who "is short the stock", that Mr. Parker is a "con man"); Ex. 2 (KerrisDale authors "have short positions" in ParkerVision); *see* Exs. 5, 7-16.

Some documents attack Mr. Parker personally including blog posts and reports calling

---

[1] All references to Exhibits are to those attached to the Declaration of Z. Ellis.

him a "con man" (Exs. 6, 17), while other articles chronicle perceived shortcomings of ParkerVision and/or stumbling blocks – many of which discuss other ParkerVision lawsuits. Exs. 2, 9, 18-20. Some documents purport to provide "expert" analysis about unasserted/unrelated ParkerVision patents, provide opinions regarding the value of ParkerVision's technology, or argue that ParkerVision's lawsuits are "baseless." Exs. 2, 21-22.[2] Intel also makes clear that it plans to admit evidence and discuss other disparaging hearsay comments regarding ParkerVision technology – e.g., ███████████████████ D.I. 148, at ¶¶36, 38; *see also* Exs. 23-28.

Because these statements/allegations do not tend to make the fact of infringement or validity "more or less probable," they are irrelevant under Rule 401 and inadmissible under Rule 402. Albeit colorful, these statements/allegations have no place in a patent trial.

This subject matter is only offered to paint ParkerVision in a harsh and negative light. Even if the subject matter had any marginal relevance to this action (it does not), it should be precluded under Fed. R. Evid. 403. These unflattering statements and unproven allegations will likely cause unfair prejudice, confuse the issues, and mislead the jury.[3]

Lastly, the statements that Intel seek to admit are reports about what third parties think or said and are inadmissible hearsay under Rule 802.

**B.    MIL#2 -- Prior litigations, ITC, and IPRs**

Based on its pre-trial disclosures, Intel plans to discuss and offer documents into evidence related to other U.S. litigations, German litigations,[4] as well as IPRs and ITC proceedings. These

---

[2] Lay opinions from the media or critics are not admissible under Rules 702 and 703.
[3] This subject matter is also objectionable pursuant to Fed. R. Evid. 404 §§ (a)(1) and (b)(1) to the extent that Intel suggest they bear on ParkerVision's business practices or witness character.
[4] ParkerVision asserted a European patent against SMARTi 5, an accused chip here. Intel sued for invalidity. The European claims are different than the claims here. In Germany, there is *no discovery* and courts apply *EU/German* law in determining construction/infringement/validity. Ex. 30, Haft (Intel's German attorney) 4/28/22 Tr. at 68:19-69:4; 70:8-19; 85:14-21; 91:9-21.

matters involve, for example, (1) cases that ParkerVision lost or dismissed against Apple and Qualcomm related to different patents and technology, (2) IPRs on unasserted patents (one of which is on appeal),[5] and (3) litigations against e.g., Buffalo and ZyXel, that have settled or are pending. Documents or discussions regarding these matters should be excluded under Fed. R. Evid. 401, 402, 403, and/or 802. *See CloudofChange, LLC v. NCR Corp.*, No. 6:19-CV-513-ADA, D.I. No. 204 at *3 (W.D. Tex. Nov. 8, 2021); *VLSI Tech. LLCS v. Intel Corp.,* Civil No.: W:21-CV-57-ADA, D.I. No.: 508 at *3 (W.D. Tex. Feb. 19, 2021).

Intel also seeks to admit *hearsay* testimony from these *other proceedings* through trial/ deposition transcripts of Parker, Sorrells, Leach, Rawlins, Bultman, Cook, Harlan, Moses. See Ex. 29, Intel Exhibit List DTX-392, 405, 411, 413, 466-469, 479, 480, 493, 500, 501, 567-570, 584, 585, 596-598, 615, 639-641, 644, 645, 669, 670.[6] But Intel deposed *all* of these witnesses in *this* case. Notably, nothing from these prior case depositions/transcripts was designated, no opportunity for objections existed, and they would divulge details of other litigations.

Moreover, Parker, Sorrells, and Leach will be testifying at trial and can be cross-examined. There is no justification for admitting testimony from prior proceedings here. *Powertrain, Inc. v. Ma*, 640 F. App'x 263, 265 (5th Cir. 2016) ("'[a] deposition may not be introduced into the record at a trial . . . for any purpose unless the witness is unavailable or exceptional circumstances justify its admission.'")[7]

None of Rawlins (except from July 2017 to March 2020), Bultman, Cook, Harlan, or

---

[5] *See* Ex. 29, entries DTX-149, 239, 476, 494, 496, 497, 498.
[6] Intel also seeks to admit Qualcomm trial transcripts (DTX-320, 404, 459, 653) and technology tutorials (DTX-642, 646), which should also be excluded.
[7] Intel's attempt to backdoor testimony from other cases by reading it into depositions in this case – as if witnesses were being impeached – should be excluded. This is highly confusing and prejudicial. See, e.g., Exs. 31-33 at 14-20, 23-24, 45-48, 56-58, 93-94, 101-104, 113-117, 124-125, 126-34, 157-159, 163-164, 171-172, 175-181, 198-200, 212-213, 226-229, 305-307.

Moses have ever been officers or directors, only Mr. Rawlins has been a designated 30b6 witness in a prior case, and Bultman and Cook were always third-party witnesses. Testimony by all the witnesses from prior cases should be excluded because the prior cases did not "involve[e] the same subject matter between the same parties . . . to the same extent as if taken in the later action." Fed R. Civ. P. 32(a)(8). *See Powertrain,* 640 F. App'x 263 at 266 (affirming exclusion of "depositions under Rule 32(a)(8) because the depositions were taken in an action involving different parties with different motives and the action involved different issues.").[8]

Accordingly, Intel should be precluded from using prior transcripts or discussing other proceedings for any purpose other than impeachment of a testifying witness. For impeachment, Intel should be precluded from mentioning the case where the testimony came from.

## C.    MIL# 3 -- Inventor testimony – claim scope, infringement, prior art

While Intel is entitled to discuss what the ParkerVision inventors believe they invented, Intel is not entitled to make the inventors into experts and question them about the scope of the claims, what would fall within the scope of the patents, or prior art. Inventor testimony is wholly irrelevant to these issues. *Cordis Corp. v. Bos. Sci. Corp.*, 561 F.3d 1319, 1338 (Fed. Cir. 2009) ("inventor's subjective intent is irrelevant to the issue of claim construction" and "alleged infringement"). Yet, Intel has designated testimony from inventors in this case on these issues. *See, e.g.*, Ex. 31, Sorrells 3/17/22, Tr. at 54:25-55:13; 98:1-10; 101:13-104:1; 112:19-121:13; 124:1-15; 125:4-11; 126:1-134:15; 213:1-20.[9] Such testimony is inadmissible under Rule 701.

---

[8] The Court can also use its discretion over the regulation of evidence in this case to prevent mass dumping of transcripts from other cases.

[9] *See also* Ex. 32, Sorrells 7/25/22 Tr. at 247:13-251:9; 253:5-255:25; 257:2-4; 261:15-264:2; 265:5-267:13; 282:21-283:4; 286:25-288:2; 289:12-19; Ex. 33 Sorrells 10/5/2022 Tr. at 350:8-15; Ex. 34, Cook 8/29/22 Tr. at 122:12-23; 123:10-124:15; 125:20-126:12; 129:20-130:25; 133:21-136:23; 141:1-19; 144:8-145:3; 150:21-151:21; 153:20-154:16; Ex. 35, Cook 2/15/22 Tr. at 42:2-22; 53:4-18; 59:4-19; 59:8-12; 62:20-64:9; 65:12-68:25; 70:9-21; Ex. 36, Rawlins

Intel is seeking to turn inventors into experts and trying to elicit opinions, <u>not</u> *facts*. Thus, these designations (and other documents/questioning on these subjects) should be precluded.

### D.    MIL#4 – Internal ParkerVision criticisms/disagreements

Intel has identified documents and designated testimony of ███████████████



█████████ *See, e.g.,* Ex. 37, Stuckey 8/10/22 Tr. at 66:2-99:11; 107:5-8; Exs. 38-40. Intel also plans to introduce evidence related to in-fighting between ParkerVision employees over product/business direction. *See e.g.,* Exs. 41-42; Ex. 34, Cook 8/29/22 Tr. at 158:13-160:25; Ex. 36, Rawlins 9/22/22 Tr. at 164:18-167:1; 168:8-22; 174:2-180:6; 208:10-230:25; 231:8-235:25; 243:14-244:24; Ex. 43, Moses 2/16/22 Tr. at 133:15-134:19; 142:22-144:10.

Moreover, Intel plans to admit evidence regarding employee disagreements about ParkerVision's work████████████████D.I. 148 at ¶ 62. For example, internal communications describing the ████████████████████████

████████████████████████████████████████

███████████████████ Ex. 44.

Yet again, all of the above is just more mud that is irrelevant to any issue for the jury to decide and exclusion of the prejudicial/confusing material is warranted under Rules 401-403.

### E.    MIL#5 -- Discussions related to proposed chip for LGIT

In 2008, ParkerVision entered into an agreement with █████to develop a RF transceiver chip for a modem. To meet ███████timeline, ParkerVision decided to incorporate ParkerVision's D2P transmitter technology into an ████████████ that was already available in the market. Intel has identified documents/designated extensive testimony on this issue. *See e.g.,* Ex. 45,

---

9/22/22 Tr. at 50:2-55:25; 57:11-58:2; 69:16-70:4; 95:19-23; 104:4-105:22; 112:24-117:21; 119:9-120:14; 122:24-125:7; 131:2-132:8; 133:4-135:14.

Parker 6/23/22 Tr. at 325:14-331:9; 342:25-346:11; 380:18-391:14; 393:25-395:17.[10]

First, Intel seeks to use this evidence to disparage ParkerVision's ability to develop its own D2D receiver technology commercially.[11] But, that ParkerVision chose to use ████████ ██ (including its receiver) *to meet a deadline* has nothing to do with any issue in this case.

Second, Intel will try to paint a false picture that ParkerVision misled investors around the ████████████ D.I. 148, ¶¶ 36, 62. Again, Intel has identified documents/designated extensive testimony around this issue. *See e.g.,* Ex. 45, Parker 6/23/22 Tr. at 318:23-331:1; 341:9-356:8; Exs. 48-54. This subject matter is irrelevant to any issue for the jury. To the extent there is any probative value at all, it is substantially outweighed by the risk of prejudice/jury confusion. Exclusion under Rules 401-403 is warranted.

### F.      MIL#6 – Statement by Dale Klotz and Forbes article re ParkerVision

In its ongoing mud-slinging, Intel seeks to present the testimony of Mr. Klotz regarding testing his former employer, Boeing, performed in 1997/1998 on ParkerVision's *first prototype* chip. At bottom, Mr. Klotz takes issues with how ParkerVision characterized this testing in a 1998 press release. Over *twenty years* later, Mr. Klotz is still bothered. But his *personal* views are irrelevant to any issues here and should be excluded under Rules 401-403. And Intel's attempts to elicit testimony from other witnesses about Mr. Klotz should also be excluded.[12]

In 1997, Eddie1 was ParkerVision's first attempt to implement its D2D technology. ParkerVision performed internal tests of Eddie1 but sought independent confirmation of its results and asked ████████████████████████ Ex. 55. Mr. Klotz was a project

---

[10] *See also* Ex. 46, Leach 1/7/22 Tr. at 49:15-52:5; 57:18-61:14; 67:7-18; 68:2-9; Ex. 47, Leach 8/1/22 Tr. at 56:3-62:17; Ex. 36, Rawlins 9/22/22 Tr. at 140:2-161:19; 180:20-187:2; 197:1-202:18; Ex. 31, Sorrells 3/17/22 Tr. at 174:22-178:10.
[11] Similarly, testimony/documents related to not delivering products to other companies (e.g., ████████ should also be excluded. *See e.g.,* Ex. 36, Rawlins 9/22/22 Tr. at 202:23-207:15.
[12] *See e.g.,* Ex. 31, Sorrells 3/17/22 Tr. at 150:22-154:6.

manager but *did not perform any analysis*. Ex. 56, Klotz 8/2/22 Tr. at 27:22-28:15. ████████ ██████████████████████████████ In March 1998, ParkerVision issued a press release disclosing that Boeing ran tests and stating its own view of those results. Ex. 57.

In September 1999, Forbes published an article, a portion of which discussed Manual Asensio's (a short-seller of ParkerVision stock) view of ParkerVision's technology. Ex. 58. Without permission, Mr. Klotz (in his *personal* capacity) was quoted in the article (1) stating ParkerVision had to make some specification adjustments, (2) questioning what technology ParkerVision used, and (3) speculating that Boeing could make a better product. *Id.*



Ex. 56, Klotz 8/2/22 Tr. at 59:12-60:14; 61:1-62:16; 63:21-64:2; 98:2-8. ████████████████ ██████████████ *Id*. at 58:22-59:17; 77:9-78:24. ████████████████████████████ ████████████████████████████████ ████████████████ *Id*. at 147:6-149:14; 157:5-12. Any probative value in Mr. Klotz's testimony is substantially outweighed by the risk of prejudice/jury confusion.

### G.    MIL#7 -- Dr. Steer's compensation and excluded opinions in other cases

Dr. Steer has worked on two other ParkerVision cases. His compensation in those cases is irrelevant here. Likewise, that certain of his testimony was excluded in a Qualcomm litigation (*currently being appealed*) and an ITC case is irrelevant to whether Dr. Steer is qualified to testify here. The prejudice raising these issues outweighs any probative value under Rule 403.

With regard to the ITC proceeding, the ALJ's decision to exclude testimony of Dr. Steer was based on timing or disclosure deficiencies. Ex. 59. These issues in no way affect the disclosures made in this case. In the Qualcomm case, Dr. Steer replaced another expert and

inherited the material prepared by the previous expert. D.I. 22 at 29. Moreover, the court's

criticism in the Qualcomm case of his failure to conduct simulations has no probative value in

this case where Dr. Steer provided *hundreds of pages* of simulation setup/results. See Ex. 60.

Courts recognize that the exclusion of expert testimony in one case should not be

admitted in a later case.  *See e.g. Fitzhenry-Russell v. Keurig Dr Pepper, Inc.*, No. 17-cv-00564-

NC, 2018 U.S. Dist. LEXIS 234910, at *12 (N.D. Cal. 2018) (exclusion in another case

irrelevant "to whether that expert is qualified or suited to testify in this case. The potential for

prejudice outweighs any probative value this evidence may have."); *BladeRoom Grp., Ltd. v.*

*Facebook, Inc.*, No. 5:15-cv-01370-EJD, 2018 U.S. Dist. LEXIS 54916, at *11 (N.D. Cal. 2018)

(discussing exclusion would confuse and mislead the jury). Particularly here, where the decision

to exclude is currently on appeal and may be expunged, the non-final decision should not be

offered, discussed, or used for examination purposes. Ex. 61; *see also* D.I. 22 at 45.[13]

### H.      MIL#8 --Undisclosed expert opinions of former Intel engineers

Testing (simulation) of the accused SMARTi chips is important to understanding their

operation. Recognizing that the evidence from fact discovery (████████████████

██████████████████████████████████████) would yield undesirable

simulation results, Dr. Subramanian relied on *side conversations* with former Intel engineers –

Drs. Hull, Schelmbauer, and Klepser ("Former Engineers")[14] – to set up his simulations. Ex. 64,

pp. 159-161; Appendix A, pp. 23-24, 77-79, 133-136. He did so to justify *deviating* from how

the accused SMARTi chips were actually configured/simulated. Unbounded by actual facts, he

---

[13] As further explained in MIL#2 and MIL#7, the existence of, testimony in, or results of other
litigation involving ParkerVision should not be a subject explored at this trial.

[14] Even then, the Former Engineers are relying on their memory about complicated circuits. Dr.
Klepser left Intel over *five* years ago; Dr. Schelmbauer left Intel over *three* years ago. Ex. 62,
Klepser 6/23/22 Tr. 12:1-15; Ex. 63, Schelmbauer Tr. 7/1/22 at 18:11-12.

set-up his simulations to back into results that he viewed as favorable. *See* D.I. 177, Sect. I.C-I.E.

The Former Engineers' opinions regarding how chips *could* be configured/simulated are undisclosed expert opinions. Fed. R. Civ. Pro. 26(a)(2)(A). Their opinions are <u>not</u> facts (or opinion testimony of a lay witness under Fed. R. Evid. 701), but, instead, are conclusions based on scientific, technical, and specialized knowledge of circuitry. They are expert opinions under Rule 702. Intel, however, never disclosed the Former Engineers as experts nor did these Former Engineers provide expert reports. Thus, ParkerVision was deprived of the opportunity to explore/challenge their opinions, which formed the basis of Dr. Subramanian's simulations. To compound the issue, Dr. Subramanian's expert report does not identify who gave him what information nor could he remember at this deposition. *See e.g.,* Ex. 65, Subramanian 10/20/22 Tr. at 162:7-23; 188:20-189:6; 194:22-195:5; see D.I. 231, pp. 9, 10. But who gave him information matters. ███████████████████████████████████████ *Id*. at pp. 3-4. At trial, the Former Engineers should be precluded from testifying on this issue and Dr. Subramanian should be precluded from relying upon his discussions with them.

## I.    MIL#9 -- Dr. Subramanian late simulations (and underlying data)

During his October 18th deposition, Intel asked Dr. Steer (ParkerVision's expert) to identify errors in Dr. Subramanian's (Intel's expert) simulations. Ex. 66, Steer 10/18/22 Tr. at 397:15-16; 398:17. Dr. Steer provided detailed criticisms. *See e.g., id*. at 396:24-402:16. Dr. Subramanian learned of Dr. Steer's criticisms on October 19th—and was deposed the following two days on October 20th and 21st. Ex. 67 Subramanian 10/21/22 Tr. at 437:11-15.

At his deposition, Dr. Subramanian testified that (1) prior to serving his expert report, he varied certain parameters in *undisclosed* simulations ("pre-report undisclosed simulations") and, thus, already considered certain of Dr. Steer's criticisms, and (2) he re-ran simulations *before* his October 20th deposition ("re-run simulations"). *See e.g., id*. at 440:24-441:18; 442:18-443:6;

452:5-18. But, ParkerVision *never* received these simulations prior to or during Dr. Subramanian's two-day deposition. Not only was ParkerVision deprived the opportunity to prepare for Dr. Subramanian's deposition and explore/challenge these simulations, but ParkerVision could likewise not prepare Dr. Steer to address these simulations.

Given Dr. Subramanian's *reliance* on purported pre-report – yet undisclosed – simulations, ParkerVision sent an email to Intel's counsel requesting those simulations. Ex. 68. Intel refused to produce them. *Id.* Instead, on October 27th (17 days after expert reports), Intel sent *raw data* underlying the purported *re-run* simulations.

There are three issues here: (1) ParkerVision never received the undisclosed pre-report simulations; (2) Intel is attempting to add re-run simulation data that was never disclosed in a report, and (3) the re-run simulation *results* Intel seeks to rely upon have never been provided and raw data used in the simulations is insufficient.[15] Thus, Dr. Subramanian should be precluded from testifying about the undisclosed pre-report and post-report re-run simulations.

**J.      MIL#10 -- Evidence related to the PMB2407, PMB4402, RF100 and BBA2**

Intel's expert (Dr. Subramanian) asserts invalidity based on three chips: (1) PMB2407, (2) RF100, and (3) BBA2. He states that these chips were publicly known, used, or sold prior to the claimed inventions. But there is no competent evidence they are 102/103 prior art – and, in fact, the evidence makes that assertion implausible. Discussion about these chips would be misleading/confusing to the jury, unfairly prejudicial and, thus, should be precluded including testimony from Dr. Hull, Dr. Klepser; Mr. Jaffee; and Ms. Tanzillo.[16]

<u>PMB2407</u>: First, Intel does not have the PMB2407 schematics and, thus, Dr.

---

[15] Raw data needs to be input into a program and then set-up must be performed to produce simulation results. ParkerVision has no idea what results Dr. Subramanian actually saw.
[16] Similarly, reference to a Siemens phone with PMB 4420 chip should be excluded. There is no testimony about chip configuration/operation. Ex. 70, Tanzillo Tr. at 10:24-12:11; 12:24-14:11.

Subramanian never analyzes the chip – so there is no evidence regarding how the chip was configured/functioned. This alone renders any discussion regarding the PMB2407 irrelevant/ unreliable. Second, Dr. Subramanian asserts that the PMB2407 was incorporated into a Siemens phone relying on Dr. Klepser and Ms. Tanzillo. But they too have no knowledge about the *actual* chip in Siemens phones. Dr. Klepser, a former Siemens engineer, testified that he was not involved in the design/development/production of the PMB2407, only remembers PMB2407 high-level *block* diagrams, and does <u>not</u> recall the schematic details. PMB2407. Ex. 69, Klepser 10/5/22 Tr. at 5:20-6:7; 6:17-7:4; 8:19-25; 10:7-10, 13-14. Ms. Tanzillo (Siemens marketing) is not a technical person and has no knowledge whether the PMB2407 is in Siemens phones or how the chips in the phones are configured/operate. Ex. 70, Tanzillo 10/3/22 at 8:5-13; 22:4-24:6.

    <u>RF100</u>: Dr. Subramanian asserts that the RF100 (made by Rockwell) is found in certain Sony and Sanyo phones, relying on the say-so of Dr. Hull. With regard to the Sony phone, Dr. Hull merely has a *circuit board* with a chip labeled RF100, which he states was inside a phone he allegedly purchased sometime in the late 1990s. Ex. 71; Ex. 72, Hull 10/2/22 Tr. at 11:2-8. But there is nothing identifying any specific Sony phone/date on the board and Dr. Hull does not have the phone itself, or any corroborating evidence – receipt, box, or manual for the Sony phone. *Id*. at 11:23-12:17. Similarly, while Dr. Hull alleges that he purchased a Sanyo phone in each of 1996, 1997 and 1998, he does not have any corroborating evidence. *Id*. at 9:19-10:2; Ex. 73, Hull 6/26/22 Tr. at 329:9-16. So Intel only has a Sony board and a Sanyo phone – neither of which can be dated. Without evidence of dates of sale, these objects are irrelevant.

    Further, to demonstrate invalidity for *each* asserted claim, Dr. Subramanian relies on a *specific* reference design that cannot be tied to any sold phones (much less any during the right period). That design adds an *external* filter connected to the RF100 – a filter using capacitors. He

relies solely on Dr. Hull who stated that the filter design was merely "recommended" and "not necessarily exactly the same as the schematics of the phone, because those are done by the phone manufacturer [i.e., Sanyo and Sony]." *Id.* at 37:17-39:23. There is no evidence from anybody at Sanyo or Sony – the only folks that would know – that any Sanyo or Sony phones actually used a filter with capacitors (much less the date of any such use.) And while Dr. Hull testified that he believed that Sanyo/Sony implemented a filter with capacitors (speculation Dr. Subramanian did not rely on), this is inadmissible under Rule 701. Dr. Hull is <u>not</u> testifying to a *fact*; his opinion is that of an expert under Rule 702. But Dr. Hull was not disclosed as an expert.

Finally, and rendering implausible Dr. Subramanian's theory, are the two sets of schematics related to the RF100 that he relies upon – RF100 schematics (Ex. 74) and schematics of a *test* chip (GA137) (Ex. 75). But Dr. Hull testified that the GA137 was <u>not</u> used in Sanyo/Sony phones, so it is irrelevant. *Id.* at 42:1-43:11. And other than uncorroborated testimony of Dr. Hull, there is nothing (e.g., no correspondence or sales records) demonstrating that chips in the Sanyo/Sony phones *actually* used the RF100 schematics on which Dr. Subramanian relies. Indeed, the RF100 schematics are dated March *1998* (Ex. 74 at 96103DOC00249877). Thus, contrary to Dr. Subramanian's position, these schematics cannot be the R100 version used in phones sold "at least as early as 1996". Ex. 76, ¶441. Thus, it is unknown whether – or when – any phone used a chip with the layout in the RF100 schematics. Thus, reference to (and any testimony about) the schematics should be excluded at trial.

<u>BBA2:</u> Dr. Subramanian states that BBA2 was sold in the United States in "at least 1996 and 1997." Ex. 76, ¶456. The BBA2 schematics are dated July 24, 1997 (Ex. 77). So nothing with that layout was sold anytime before then. Even then, Qualcomm's 30b6 witness stated that the BBA2 schematics were "*one particular version* of BBA2." Ex. 78, Jaffe 7/27/22 Tr. at

257:12-15. Thus, there is nothing indicating this version of the layout was adopted as final, ever included in any chip, much less one sold in the United States during a relevant time period.

<u>Not publicly accessible</u>: Section 102 is an exacting standard and Intel has a high burden of proving invalidity. Yet, Intel never analyzed the *actual* chips in any of alleged prior art phones or *actual* chips that were sold by Siemens, Qualcomm, or Rockwell. "[T]he 'known or used' prong of § 102(a) refers to 'knowledge or use which is accessible to the public.'" *BASF Corp. v. SNF Holding Co.,* 955 F.3d 958, 964 (Fed. Cir. 2020). Such prior knowledge or use must be accessible to the public "upon reasonable inquiry." *Id*. at 965 ("Prior knowledge or use that is *not accessible to the public 'upon reasonable inquiry,'* confers no benefit on the public, and thus does not suffice as a defense under § 102(a).") (emphasis added). Regarding 102(b), that Siemens, Rockwell, or Qualcomm sold/offered a chip (or phones were sold with a chip) does not implicate the "on sale" provision of 102(b). "On sale" under 102(b) is directed to precluding *an inventor* from commercializing an invention a year before the inventor files for a patent. *ResQNet.com, Inc. v. Lansa, Inc*, 594 F.3d 860, 866 (Fed. Cir. 2010). Sales or offers made *by others* that disclose the claimed invention implicate the "public use" provision of 102(b). *Id*. As with 102(a), "public use" under 102(b) must be "available to the public." *Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1371 (Fed. Cir. 1998).[17] The configuration/operation of the PMB2407, BBA2, and RF100 is proprietary and a trade secret. See e.g., Ex. 78, Jaffee 7/27/22 Tr. at 112:24-113:10. Indeed, they have microscopic components and their configuration/operation cannot be conclusively determined. Ex. 79, ¶102. Thus, details about the structure/operation of these chips (needed to prove invalidity) were <u>not</u> accessible to the public "upon reasonable inquiry." Exclusion of evidence related to these chips is warranted.

---

[17] While "public use" covers commercial exploitation, such exploitation is that of an *inventor*.

### K.     MIL# 11 -- ipCapital Group valuation

Intel has designated the deposition testimony of Cynthia French, ParkerVision's CFO, regarding a January 2011 evaluation by ipCapital Group, Inc. ("ipCG") of ParkerVision's intellectual property portfolio. *See* Ex. 80, French 6/17/22 Dep. Tr. at 179:9–200:21. ipCG's valuation was merely intended for ParkerVision's financial-reporting use, was criticized by ParkerVision's accounting firm, Price Waterhouse Cooper, and was unreliable in valuing ParkerVision's portfolio. D.I. 178. It did not apply a Georgia-Pacific analysis or purport to predict royalties from Intel. Allowing Intel to present any evidence regarding the ipCG valuation will only confuse and mislead the jury. The ipCG valuation and Ms. French's designated testimony regarding the ipCG valuation (and related evidence) should be excluded.

### L.     MIL#12 -- Allegedly comparable patents

Intel initially identified numerous agreements that it alleges included patents that were comparable to the asserted patents. These agreements covered *thousands* of patents. Given the vast number of patents that ParkerVision's technical expert would need to analyze for technical comparability and time limits for deposition of Intel's 30b6 witness (Mr. Gray) on this issue, ParkerVision requested that Intel identify specific agreement/patents on which Intel intended to rely. Intel supplemented its response to ParkerVision's Interrogatory No. 3 to identify specific patents. Ex. 81. Dr. Steer discusses the patents Intel identified and ParkerVision's damages expert relied on his analysis. In rebuttal, Intel's technical and damages experts discussed newly alleged comparable patents – patents about which Intel's witness never testified and ParkerVision's experts never opined. See Ex. 64, Section XX.E. The undisclosed patents should not be put into evidence and Intel's experts should be precluded from discussing these patents.

### M.     MIL# 13 -- Allegedly comparable licenses

Intel has asserted that two of its transactions (███████████████████) license

patents are technically comparable to ParkerVision's technology because a few patents in these deals relate to "RF down-conversion." Ex. 82, ¶¶199, 204, 207, 211, 217; Ex. 64, ¶¶ 981-82, 1007. The Federal Circuit confirmed that alleging such "loose or vague comparability between different technologies or licenses does not suffice." *Asada, Inc. v. Avery Dension Corp.*, -- F.3d-- Appeal No. 1902-2022 at p. 23 (Dec. 16, 2022) (excluding allegedly comparable licenses).

In *Asada*, the defendant alleged comparability because both the asserted patent and the licenses related to "RFID transponders."  The Court held that such "conclusory observations are insufficient to establish comparability":

> That the licensed portfolios "include" patents that cover RFID technology ***says little, if anything***, about their relation to the '967 patent.  "RFID technology" is too broad and vague a category, without more, to serve as a meaningful comparison point to the specific technology at issue in this case.

*Id.* at 24. *Asada* also held that observing "*some* patents in a portfolio" cover the broad technology area "says nothing about the comparability" of the remaining patents in the portfolio. *Id.* (emphasis in original). Because Intel only considered 4 of the 62 patents in the agreements, those agreements cannot be considered comparable and should be excluded. Ex. 64, ¶¶ 987, 992, 997, 1008.

Similarly, Intel's damages expert relies on Intel's purchase of Infineon (and its 1550 patents) because some "patents related to . . . receiver and down-conversion technology." Ex. 82 at ¶223.  He does so by simply citing to 11 of the 1550 patents as examples and without a comparability opinion of any expert.  This reference should be excluded.

### N.    MIL#14 – Litigation finance agreement

Intel seeks to introduce a litigation finance agreement between ParkerVision and Brickell Key that relates to *different* ParkerVision litigations, not this case. Ex. 83. This funding agreement is irrelevant to any issue in this case and should be excluded under Rules 401-403.

15

Dated: December 22, 2022

Respectfully submitted,

*/s/ Raymond W. Mort, III*
Raymond W. Mort, III
Texas State Bar No. 00791308
raymort@austinlaw.com
**THE MORT LAW FIRM, PLLC**
501 Congress Ave, Suite 150
Austin, Texas 78701
Tel/Fax: (512) 865-7950

Of Counsel:
Ronald M. Daignault (pro hac vice)*
Chandran B. Iyer (pro hac vice)
Jason S. Charkow (pro hac vice)*
Scott R. Samay (pro hac vice)*
Stephanie Mandir (pro hac vice)
Zachary H. Ellis (Texas Bar No. 24122606)
rdaignault@daignaultiyer.com
cbiyer@daignaultiyer.com
jcharkow@daignaultiyer.com
ssamay@daignaultiyer.com
smandir@daignaultiyer.com
zellis@daignaultiyer.com
**DAIGNAULT IYER LLP**
8618 Westwood Center Drive
Suite 150
Vienna, VA 22182
*Not admitted in Virginia

**ATTORNEYS FOR PLAINTIFF**